969 F.2d 1013
 61 USLW 2131, 27 Collier Bankr.Cas.2d 964,
23 Bankr.Ct.Dec. 593,
Bankr. L. Rep. P 74,793
 In re THOMAS B. HAMILTON COMPANY, INC., etc., Debtor.
CITIZENS AND SOUTHERN NATIONAL BANK, Plaintiff-Appellant,
v.
THOMAS B. HAMILTON CO., INC., d/b/a Patricia Ann's Sterling,
Defendant-Appellee.
 No. 91-8001.
 United States Court of Appeals, Eleventh Circuit.
 Aug. 21, 1992.
 
 Lori Powell Hughes, J. William Boone, Alston & Bird, Atlanta, Ga., for plaintiff-appellant.
 Andrew De Natale, Brian M. Cogan, Bruce R. Gitlin, Stroock & Stroock & Lavan, New York City, amicus curiae.
 Richard Kearney Valldejuli, Jr., Atlanta, Ga., for defendant-appellee.
 Appeal from the United States District Court for the Northern District of Georgia.
 Before JOHNSON*, CLARK * and PECK**, Senior Circuit Judges.
 CLARK, Senior Circuit Judge:
 
 
 1
 This bankruptcy appeal presents a question of first impression: whether a credit card merchant agreement between a merchant and a merchant bank constitutes a contract to extend "financial accommodations" within the meaning of 11 U.S.C. §§ 365(c)(2) and 365(e)(2)(B) of the Bankruptcy Code such that it may not be assumed by the merchant's trustee in bankruptcy and may be terminated by the merchant bank. The appellant Citizens & Southern National Bank ("C & S") contends that the bankruptcy court and the district court erred in concluding that the credit card merchant agreement is not a contract to extend financial accommodations and, therefore, may be assumed by the merchant's trustee in bankruptcy and may not be terminated by the merchant bank. We affirm.
 
 Background
 
 2
 The debtor, Thomas B. Hamilton Company, Inc. ("Hamilton"), is a merchant in the business of buying and selling finished sterling silver products on a retail level. In April 1980, Hamilton and C & S executed a Card Program Member Agreement (commonly referred to in the bank credit card industry as a credit card merchant agreement), which is the subject of this appeal. This agreement (hereinafter the "Agreement") permits Hamilton to accept its customers' MasterCard and Visa charge cards in the course of its business. More specifically, it provides that Hamilton shall honor valid credit cards tendered to it in the course of its business and that C & S shall purchase the sales drafts generated by these credit card transactions by making payment to Hamilton. The Agreement is crucial to Hamilton because the majority of its business is credit card sales received through telephone and mail orders.
 
 
 3
 In practice, the financial arrangement between Hamilton and C & S, which is formalized in the Agreement, works as follows. When Hamilton receives an order, either over the telephone or in the mail, from a customer who wishes to make a purchase with a credit card, Hamilton obtains the customers' credit card number and the credit card expiration date. For each sales transaction, Hamilton enters the credit card number, the credit card expiration date, and the sales amount into its point-of-sale computer terminal. As the sales are entered into this terminal, they accumulate in C & S's electronic network system, which holds the transactions until it receives instructions from Hamilton to release the batch of sales to C & S. The Agreement provides:
 
 
 4
 p 7. Presentment of all sales drafts that [Hamilton] desires [C & S] to purchase shall be made to [C & S] within three days after the applicable Transaction Date in each case.
 
 
 5
 Thus, within three days of the sales, Hamilton releases a batch of sales drafts to C & S for "purchase." The Agreement further provides:
 
 
 6
 p 8. Subject to the terms of this Agreement and as hereinafter provided, [C & S] will pay to [Hamilton] such percentage of the total amount of sales drafts presented, accepted and purchased hereunder ... as is agreed upon from time to time between [C & S] and [Hamilton].
 
 
 7
 Accordingly, for each batch of sales drafts purchased by C & S, C & S pays Hamilton an amount equalling the total amount of the sales minus a percentage agreed upon by C & S and Hamilton (which generally does not exceed four percent). According to the terms of the Agreement, payment may be made in one of two ways:
 
 
 8
 p 9. Payment and settlement with respect to each such presentment shall be made by one of the following methods which [Hamilton] may select (which selected method [Hamilton] may change from one to the other upon giving at least 30 days prior written notice to [C & S], and with [C & S's] approval which shall not be unreasonably withheld), to-wit:
 
 
 9
 (a) Payments, credits and adjustments will be made into or through a commercial checking account which [Hamilton] will maintain with [C & S], subject to [C & S's] usual commercial service charges; or,
 
 
 10
 (b) Payments due to [Hamilton] will be made by [C & S's] check, mailed two weeks after receipt of sales draft, and any payment due to [C & S] by [Hamilton] will be made promptly by [Hamilton] on demand.
 
 
 11
 Hamilton chooses to receive payment pursuant to paragraph 9(a), that is, through an account that Hamilton maintains at C & S. Thus, C & S makes payment for a batch of sales drafts by posting a credit to Hamilton's account at C & S in the amount of the total sales minus the percentage agreed upon by Hamilton and C & S (generally not to exceed four percent). C & S makes funds in the amount of the credit available for withdrawal by Hamilton on the morning of the second business day following Hamilton's release of the batch of sales drafts.
 
 
 12
 When Hamilton releases a batch of sales drafts for purchase by C & S, information regarding the credit card transactions underlying these sales drafts is simultaneously transmitted to MasterCard or Visa. MasterCard and Visa separate these transactions and transmit information regarding each transaction to the bank or other institution that issued the credit card used in the transaction. The card-issuing bank then (1) transfers funds, via the MasterCard or Visa settlement process, to C & S and (2) bills its cardholder for the sale in a periodic credit card statement.
 
 
 13
 A cardholder who discovers a billing error in his or her credit card statement has 60 days to give the card-issuing bank written notice of the error.[1] Billing errors include, among other things, a reflection on a statement of goods or services not accepted by or not delivered to the cardholder.[2] 2] By giving the card-issuing bank written notice of the billing error, the cardholder initiates what is known as a "chargeback." Upon receipt of the billing error notice, the card-issuing bank must conduct an investigation to determine whether the chargeback is valid, that is, whether the cardholder's statement does, in fact, reflect a billing error. Then, within two complete billing cycles, but in no event later than 90 days, after receiving the billing error notice, the card-issuing bank must notify the cardholder of its determination.[3] If the card-issuing bank determines that the chargeback is valid, the cardholder is relieved of all obligation to pay the card-issuing bank for the disputed item on the bill. The card-issuing bank then has a right of chargeback against C & S. C & S, in turn, then has a right to pass the chargeback on to Hamilton, provided it falls within the terms of the Agreement.[4]
 
 
 14
 Paragraphs 10 and 11 of the Agreement dictate under which circumstances C & S has the right to pass a chargeback on to Hamilton. Paragraph 10 specifically provides that Hamilton's assignment of the sales drafts to C & S pursuant to the purchasing process described above is "without recourse except as otherwise herein provided":
 
 
 15
 p 10. [Hamilton's] preparation and presentment of a sales draft to [C & S] shall constitute [Hamilton's] endorsement and assignment of same to [C & S], without recourse except as otherwise herein provided. [C & S] or its representative is authorized to place [Hamilton's] endorsement on any such sales draft at any time. [Hamilton] hereby waives notice of default or non-payment, protest or notice of protest, demand for payment and any other demand or notice in connection with this Agreement or any sales draft. [Hamilton] hereby agrees to extensions of time granted or compromises made to or with the Cardholder with respect to any such draft without affecting [Hamilton's] liability or any remedy of [C & S] thereon or hereunder.
 
 
 16
 (Emphasis added). Paragraph 11 sets out those limited situations in which C & S is entitled to recourse against Hamilton:
 
 
 17
 p 11. [Hamilton] agrees to pay [C & S] the net amount of any sales draft, and [C & S] shall have the right at any time to charge [Hamilton] therefor without notice, in any situation relating to any such sales draft where: (a) merchandise is returned, or claimed to have been returned by customer, or services are rejected, whether or not a credit voucher is delivered to [C & S]; (b) any sales transaction exceeds the dollar limitation of the Card and has not otherwise been specifically authorized by [C & S]; (c) the sales draft is alleged to have been drawn, accepted or endorsed improperly or without authority; (d) the sales draft is illegible; (e) the Cardholder disputes the sale, quality or delivery of merchandise or the performance or quality of services covered by the sales draft, and [Hamilton] fails to resolve such dispute with the Cardholder; (f) the sales draft is drawn by or credit is given to [Hamilton] in circumstances constituting a breach of any term, condition, representation, warranty, or duty of [Hamilton] hereunder; (g) the extension of credit for merchandise sold or services performed was in violation of law or the rules or regulations of any governmental agency, federal, state, local or otherwise; or (h) the Card honored is invalid, expired, or listed on any current Hot Card or Restricted Card List, or [Hamilton] has been notified that credit Card privileges have been revoked.
 
 
 18
 Thus, a valid chargeback from a customer is passed to the card-issuing bank; then to C & S, which is known as the merchant bank; then to Hamilton, the merchant, pursuant to paragraph 11 of the Agreement.
 
 
 19
 In those situations in which C & S is entitled to pass a chargeback on to Hamilton pursuant to paragraph 11 of the Agreement, C & S may obtain payment from Hamilton in one of several ways. First, the Agreement provides that C & S may deduct amounts owed to it by Hamilton from "any funds at any time held by [C & S] for [Hamilton's] use or benefit." Thus, C & S may simply deduct amounts owed from Hamilton's account. Second, in the event C & S makes payment for the sales drafts by check, the Agreement provides that Hamilton shall pay any amounts owed for chargebacks "promptly ... on demand." Thus, C & S may demand "prompt" payment for the chargeback. Third, the Agreement provides that:
 
 
 20
 p 9. ... [C & S] shall have the right and option to retain and hold, for reasonable periods of time, reserves consisting of such percentage of any such funds of [Hamilton] as [C & S] in its discretion shall deem necessary for [C & S's] reasonable protection against loss through Cardholder refunds or adjustments necessitated by billing errors or other acts or omissions on the part of [Hamilton], by credit vouchers subsequently presented, or by other contingencies beyond the control of [C & S].
 
 
 21
 Thus, C & S may hold in reserve a portion of the payments owed to Hamilton to ensure recovery of amounts that Hamilton may become obligated to pay C & S pursuant to paragraph 11 of the Agreement. If C & S establishes such a reserve, it may deduct any payments owed by Hamilton for chargebacks from the reserve. It stands to reason that, had C & S ever had any difficulty collecting payments for chargebacks from Hamilton, C & S would have established such a reserve; the record does not indicate that C & S has ever attempted to do so.
 
 
 22
 The arrangement between C & S and Hamilton is typical of arrangements between all types of merchants and financial institutions that deal in credit card transactions. If the cardholder simply does not pay his or her bill, the card-issuing bank bears the loss. If, however, the cardholder asserts a valid chargeback, such as when the cardholder has returned defective merchandise to the merchant, the merchant bank bears the loss, with recourse against the merchant.
 
 
 23
 C & S and Hamilton functioned pursuant to the Agreement and in accordance with the arrangement described above for more than nine years. In June 1989, Hamilton filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. When C & S learned of this filing, it requested that Hamilton complete a new application for a credit card merchant agreement, and Hamilton complied with this request. In processing this new application, C & S subjected Hamilton to a credit review, as it does with all merchants who apply for a credit card merchant agreement. In October 1989, C & S rejected Hamilton's new application based on the increased financial risks to C & S due to Hamilton's unstable financial condition.
 
 
 24
 C & S then filed a motion with the bankruptcy court for relief from the automatic stay. Specifically, C & S sought authorization from the court to terminate the existing Agreement "because C & S relied upon the financial strength of [Hamilton] in executing the Agreement and, under the terms of the Agreement, is now subject to new and ongoing financial risks not contemplated by the Agreement." C & S argued that the Agreement constituted a contract to extend "financial accommodations" within the meaning of § 365(c)(2) of the Bankruptcy Code and, therefore, could not be assumed by the trustee and was excepted pursuant to § 365(e)(2)(B) from the general rule prohibiting the termination of contracts because of a bankruptcy filing.
 
 
 25
 After holding an evidentiary hearing, the bankruptcy court denied C & S's motion for relief from the stay. The court held that the Agreement is not a contract to extend "financial accommodations" and, therefore, may be assumed by the trustee and may not be terminated by C & S. 115 B.R. 384. The district court affirmed the bankruptcy court's decision, and C & S filed this appeal.
 
 Discussion
 
 26
 Pursuant to § 365(a) of the Bankruptcy Code, the trustee in bankruptcy, subject to the bankruptcy court's approval, may assume an executory contract of the debtor. Section 365(e)(1) further provides that a party to an executory contract with the debtor may not terminate the contract solely because of the bankruptcy filing. Thus, the Code provides a means by which the trustee may continue contracts that will assist in the debtor's rehabilitation or liquidation. These provisions do not apply, however, to executory contracts to make a loan or extend debt financing or financial accommodations. Section 365(c) provides:
 
 
 27
 (c) The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if--
 
 
 28
 . . . . .
 
 
 29
 (2) such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor....
 
 
 30
 In language consistent with § 365(c), § 365(e)(2)(B) provides that such contracts are also excepted from the general rule, set out in § 365(e)(1), that executory contracts may not be terminated upon a bankruptcy filing.
 
 
 31
 The Agreement between Hamilton and C & S that is the subject of this appeal is clearly not a contract to "make a loan," and it is not a contract to extend traditional "debt financing." The question here is whether it is a contract to extend "financial accommodations."
 
 
 32
 The term "financial accommodations" is not defined in the statute; however, the legislative history of § 365 provides insight into Congress' intent in using this term:
 
 
 33
 Characterization of contracts to make a loan, or extend other debt financing or financial accommodations, is limited to the extension of cash or a line of credit and is not intended to embrace ordinary leases or contracts to provide goods or services with payments to be made over time.[5]
 
 
 34
 Consistent with this legislative history, the authors of Collier on Bankruptcy have concluded that the term "financial accommodations" must be strictly construed:
 
 
 35
 The drafting of [§ 365(c)(2) ] is limited ... and applies only to extensions of credit which are "loans," "debt financing," or "financial accommodations," and not to all contracts to extend credit. [Footnote omitted.] These terms are to be strictly construed and do not extend to an ordinary contract to provide goods and services that has incidental financial accommodations or extensions of credit. [Footnote omitted.][6]
 
 
 36
 The courts that have construed § 365(c)(2) consistently agree with this commentary. Citing the legislative history quoted above and this passage from Collier on Bankruptcy, these courts uniformly conclude that § 365(c)(2) does not apply to all contracts that involve the extension of credit; rather, it applies to "contracts to make loans and other traditional kinds of debt financing arrangements."[7] Thus, courts define the term "financial accommodations" narrowly, as "the extension of money or credit to accommodate another."[8] Courts also distinguish between contracts for which the extension of credit is the primary purpose, that is, a primary contractual obligation, and contracts in which the extension of credit is only incidental to or a part of a larger arrangement involving the debtor; the former constitute contracts to extend financial accommodations while the latter do not. For example, in In re Cole Brothers, Inc., the bankruptcy court held that a set of related contracts establishing the debtor as a dealer for John Deere companies were assumable by the trustee notwithstanding that several of the contracts were financing agreements; the court determined that these financing agreements were "necessary but still incidental to the overall arrangement."[9] And in In re The Travel Shoppe, the bankruptcy court, holding that an agreement to provide blank airline tickets and clearinghouse services to a debtor travel agent did not constitute a contract to extend financial accommodations, reasoned:
 
 
 37
 To interpret "financial accommodations" to include the ... agreement simply because the debtor may not make deposits from sales on time would turn every contract where the debtor owed money into a contract for financial accommodations and would "allow the exception to swallow the rule." [Citations omitted.][10]
 
 
 38
 On the other hand, courts have held that loan commitments, guaranty and surety contracts, and other contracts the principle purpose of which is to extend financing to or guarantee the financial obligations of the debtor are contracts to extend financial accommodations within the meaning of § 365(c)(2).[11]
 
 
 39
 We agree with these authorities that the term "financial accommodations" should be construed to mean "the extension of money or credit to accommodate another." We also agree that a contract is not one to extend financial accommodations merely because it involves an extension of credit that is incidental to the overall arrangement between the parties.
 
 
 40
 With these principles in mind, we begin by analyzing, as one court has put it, "the true legal nature"[12] of the Agreement between Hamilton and C & S. If the purpose of the Agreement is to provide financing, then it is a contract to extend financial accommodations within the meaning of §§ 365(c)(2) and 365(e)(2)(B); on the other hand, if the Agreement establishes a contractual business relationship and any financing that is a part of this relationship is only incidental to the relationship, then the Agreement does not fall within the ambit of §§ 365(c)(2) and 365(e)(2)(B).[13]
 
 
 41
 The opening paragraph of the Agreement sets out its purpose:
 
 
 42
 In connection with sales of merchandise or services, [Hamilton] desires to honor [various credit cards. Hamilton] ... from time to time may present to [C & S] for acceptance or payment sales drafts arising from use of Cards by [Hamilton's] customers ... in connection with such sales.
 
 
 43
 Thus, the purpose of the Agreement is to establish a relationship that will permit Hamilton to accept the use by customers of credit cards instead of cash in the course of its business and permit C & S to purchase the sales drafts arising from the resulting credit card transactions. Its purpose is not to provide financing.
 
 
 44
 Moreover, the specific terms of the Agreement do not evidence any intent on the part of C & S to extend credit to Hamilton. These terms contemplate a sale by Hamilton and a purchase by C & S of sales drafts without recourse except for the limited situations set out in paragraph 11, which do not include the simple failure by a customer to pay his or her bill. Hamilton is obligated to repay to C & S the amount of any sales draft that is invalid for one of the reasons set out in paragraph 11, that is, when a customer has a valid chargeback. Thus, the Agreement provides for an exchange of items, sales drafts, for money, with an obligation by Hamilton to repay C & S in certain limited situations, such as when a customer returns defective merchandise. Such an extension of credit can only be viewed as incidental to the overall relationship between C & S and Hamilton. The Agreement is not, therefore, a contract to extend financial accommodations within the meaning of §§ 365(c)(2) and 365(e)(2)(B).
 
 
 45
 Sound policy considerations support this conclusion. The Agreement at issue here is typical of credit card merchant agreements between all kinds of merchants and merchant banks. If these agreements may not be assumed by the trustee following a bankruptcy filing, rehabilitation will be virtually impossible for any merchant who relies heavily on credit card sales. One bankruptcy court, determining that the agreement between a debtor travel agency and an airline ticket clearinghouse was assumable, expressed its concern as follows:
 
 
 46
 As a nationwide clearinghouse for travel agencies, the [clearinghouse] agreement is a sine qua non for any independent travel agency business. If the Court were to agree with [the clearinghouse] that the agreement is not assumable then in effect [the clearinghouse], and not the bankruptcy courts, would be in control of virtually all travel agency bankruptcies nationwide, even where the debtor was not in default in its obligations to [the clearinghouse]. This result is clearly contrary to congressional intent to place the reorganization of all businesses except financial institutions in the hands of the bankruptcy courts.[14]
 
 
 47
 In reaching our conclusion that the Agreement is not a contract to extend financial accommodations, we review the Agreement not only in the context of the relationship between Hamilton and C & S, but also in the context of the larger relationship between Hamilton (the merchant), C & S (the merchant bank), the credit card company (MasterCard or Visa), the card-issuing bank, and the cardholder. We find it compelling that, in this larger relationship, it is the card-issuing bank, not the merchant bank, that carries the primary contractual obligation to extend credit; it is the card-issuing bank that bears the risk of a cardholder who cannot, or will not, pay for a valid credit card transaction.
 
 
 48
 We do recognize, however, that credit card merchant agreements place merchant banks at risk to the extent they may be liable for chargebacks they are unable to recover from the merchant, and we acknowledge that the level of this risk is dependent in part upon the financial stability of the merchant. We find, however, that the provisions of the Bankruptcy Code adequately protect the banks against the forced assumption of unreasonable risk. First, § 365(a) provides that the trustee, subject to the bankruptcy court's approval, may assume an executory contract. Obviously, the bankruptcy court should not approve the assumption of a credit card merchant agreement if the merchant bank demonstrates that continued performance of the agreement would place it at unreasonable risk, such as when the merchant's sales result in an unusually high percentage of chargebacks or when there is some evidence that the merchant is involved in fraud. Second, § 365(b) provides that the trustee may not assume an executory contract if there has been a default, unless the trustee cures the default and provides adequate assurance of future performance under the contract. Thus, a merchant who has not promptly repaid chargebacks in accordance with the credit card merchant agreement may not assume the agreement without first curing the default and providing assurance that it can and will promptly repay chargebacks in the future.[15]
 
 
 49
 In sum, we hold that credit card merchant agreements such as the Agreement at issue here are not contracts to extend financial accommodations within the meaning of §§ 365(c)(2) and 365(e)(2)(B); that is, we conclude that a contract is not one to extend financial accommodations when it involves an agreement for a bank to purchase credit card sales drafts from a merchant with recourse against the merchant for rejected sales. We acknowledge, however, that there may be circumstances in which the bankruptcy court should decline to approve the assumption of such an agreement because its continued performance would put the merchant bank at unreasonable risk. The case before us, however, is not one of these circumstances. At the hearing before the bankruptcy court, an employee of C & S testified that the chargebacks to Hamilton's account over the past 12 months had not been significant, that C & S had not experienced any problems with collecting chargebacks from Hamilton, and that Hamilton did not owe C & S any money.[16] Moreover, the terms of the Agreement provide a means for C & S to protect itself against chargebacks by holding a portion of the payments due to Hamilton in reserve. C & S apparently has never deemed it necessary to avail itself of this provision. The argument that our holding in this case will put merchant banks at unreasonable risk is without merit in general, and is particularly without merit as applied to this case.
 
 
 50
 C & S argues that the funds credited to Hamilton's account in exchange for sales drafts are provisional credit only because C & S does not receive final payment for the sales drafts until months later, when cardholders may no longer initiate a valid chargeback. Thus, C & S argues, the funds credited are actually an advancement of C & S's own funds and, therefore, are in the nature of a loan. This argument is meritless. First, C & S has failed either to provide us with copies of the MasterCard and Visa operating rules and regulations or to offer any other evidence to support this argument.[17] Second, C & S's position that the funds credited are an advancement of its own funds is inconsistent with the Agreement. The Agreement specifically refers to C & S's "payment" for the sales drafts. The term "payment" generally means the delivery of money or its equivalent by one from whom it is due to another to whom it is due;[18] it does not mean the advancement of funds in the form of a loan. Indeed, in paragraph nine of the Agreement, which provides that C & S may hold payments in reserve to cover chargebacks, the payments are referred to as "funds of [Hamilton]," not as funds of C & S. Moreover, the Agreement provides that, at Hamilton's request, C & S will pay for the sales drafts by bank check, rather than by crediting Hamilton's account. It is inconceivable that funds paid out by bank check should remain the property of C & S absent some indication of such an arrangement in the Agreement. This argument, then, and the other similar arguments advanced by C & S, do not support its contention that the Agreement is a contract to extend financial accommodations.
 
 Conclusion
 
 51
 In conclusion, we hold that a credit card merchant agreement such as the Agreement at issue in this case is not a contract to extend financial accommodations within the meaning of §§ 365(c)(2) and 365(e)(2)(B). Subject to the bankruptcy court's approval, such agreements may be assumed by the trustee and may not be automatically terminated due to a bankruptcy filing. Because C & S failed to demonstrate that the continued performance of the Agreement would place it at unreasonable risk, the bankruptcy court correctly ruled that Hamilton could assume the Agreement and C & S may not terminate the Agreement. Accordingly, the decision of the district court affirming the decision of the bankruptcy court is AFFIRMED.
 
 
 
 *
 See Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit
 
 
 **
 Honorable John W. Peck, Senior U.S. Circuit Judge for the Sixth Circuit, sitting by designation
 
 
 [1]
 15 U.S.C. § 1666(a); 12 C.F.R. § 226.13(b)
 
 
 [2]
 15 U.S.C. § 1666(b); 12 C.F.R. § 226.13(a)
 
 
 [3]
 15 U.S.C. § 1666(a); 12 C.F.R. § 226.13(c), (e), (f)
 
 
 [4]
 Assuming compliance with the applicable statute and regulation, this chargeback process should be completed within 150 days of the time the card-issuing bank bills the cardholder for the credit card transaction; this allows for the 60 days within which the cardholder must give the card-issuing bank notice of the billing error and the 90 days within which the card-issuing bank must conduct its investigation and determine whether the chargeback is valid. C & S contends, however, that, "[p]ursuant to the applicable federal rules and regulations and the MasterCard and Visa operating rules and regulations, cardholders have approximately seven and a half (7 1/2) months to elect to dispute sales and an indefinite period of time to assert claims and defenses arising out of the credit card sales transactions." (Brief of Appellant at 19). This contention is wholly unsupported by either the law or the record. We find no reference in either 15 U.S.C. § 1666 or 12 C.F.R. § 226.13 to the seven and a half month period or to the indefinite period. Although we are unable to review the "MasterCard and Visa operating rules and regulations" because C & S failed to make these documents available to the district court, see note 17, we find it inconceivable that these documents contain provisions contrary to the statute and the regulation, which clearly contemplate that billing errors will be resolved within 150 days
 
 
 [5]
 124 Cong.Rec. H11089 (daily ed. September 28, 1978) (statement of Rep. Edwards), reprinted in 1978 U.S.C.C.A.N. 5787, 6436, 6447 (1978); 124 Cong.Rec. S17406 (daily ed. October 6, 1978) (statement of Sen. DeConcini), reprinted in 1978 U.S.C.C.A.N. 6505, 6515 (1978)
 
 
 [6]
 2 Collier on Bankruptcy p 365.05 (Lawrence P. King ed., 15th ed. 1992)
 
 
 [7]
 In re Wegner Farms Co., 49 B.R. 440, 444 (Bankr.N.D.Iowa 1985); see also In re Charrington Worldwide Enterprise, Inc., 110 B.R. 973, 975 (M.D.Fla.1990) (citing Collier on Bankruptcy ), remanded on other grounds, 922 F.2d 847 (11th Cir.1990) (unpublished opinion); In re Braniff, Inc., 118 B.R. 819, 845 (Bankr.M.D.Fla.1989) (using language of legislative history); In re Ambassador Travel, Inc., 98 B.R. 1018, 1020 (Bankr.S.D.Fla.1989) (citing Collier on Bankruptcy ); In re The Travel Shoppe, Inc., 88 B.R. 466, 470 (Bankr.N.D.Ga.1988) (citing Collier on Bankruptcy ); In the Matter of Wills Travel Service, Inc., 72 B.R. 380, 382 (Bankr.M.D.Fla.1987) (citing legislative history), vacated, rehearing granted, 87 B.R. 690 (Bankr.M.D.Fla.1988)
 
 
 [8]
 In re Sun Runner Marine, Inc., 945 F.2d 1089 (9th Cir.1991); In re Placid Oil Co., 72 B.R. 135, 139 (Bankr.N.D.Tex.1987)
 
 
 [9]
 In re Cole Brothers, Inc., 137 B.R. 647 (Bankr.W.D.Mich.1992). See also In re Braniff, 118 B.R. at 845 (the financing aspects of contracts involving rights to aircraft were incidental to the purpose of the overall agreement and, therefore, were not "financial accommodations" within the meaning of § 365(c)(2))
 
 
 [10]
 In re The Travel Shoppe, 88 B.R. at 470. With one exception, every court that has considered the issue has determined that the agreement between the debtor travel agent and the clearinghouse does not extend financial accommodations within the meaning of § 365(c)(2). See In re Charrington, 110 B.R. at 975; In re Skylark Travel, Inc., 120 B.R. 352 (Bankr.S.D.N.Y.1990); In re Ambassador Travel, 98 B.R. at 1020-21; In re Karsh Travel, Inc., 87 B.R. 110 (Bankr.N.D.Cal.1988), aff'd, 102 B.R. 778 (N.D.Cal.1989), appeal dismissed, vacated in part, 942 F.2d 792 (9th Cir.1991); In the Matter of Wills Travel Service, 72 B.R. at 383; but see In the Matter of Lockspur, Inc., 82 B.R. 37 (Bankr.E.D.La.1987). It is noteworthy that, pursuant to these agreements, the clearinghouse is at considerably more risk than is the merchant bank under a credit card merchant agreement. The clearinghouse issues blank airline tickets to the travel agent, and the travel agent pays the clearinghouse for these tickets only after the tickets have already been issued; thus, the clearinghouse must seek recourse against the travel agent anytime the travel agent fails to make payment for the tickets it has issued. By contrast, the merchant bank purchases credit card sales drafts from the merchant, receives these drafts simultaneously with making payment for them, and obtains payment for them from a third party, the card-issuing bank; thus, the merchant bank must seek recourse against the merchant only in the case of a valid chargeback
 
 
 [11]
 See In re Sun Runner Marine, Inc., 945 F.2d at 1091 (floor financing agreement between financial institution and debtor boat manufacturer is contract to extend financial accommodations where institution made loans to debtor's boat dealers, but proceeds of loans were disbursed directly to debtor and debtor incurred secondary liability for repayment of loans to dealers); In re Taggatz, 106 B.R. 983 (Bankr.W.D.Wis.1989) (agreement obligating bank to fund unfunded portion of promissory note is contract to extend financial accommodations); In re Placid Oil, 72 B.R. at 139-40 (retrospective insurance premium arrangement whereby insurance services were provided well in advance of payment is contract to extend financial accommodations); In re Wegner Farms, 49 B.R. at 444 (surety bond is financial accommodation within the meaning of § 365(c) and (e)); In re Adana Mortgage Bankers, Inc., 12 B.R. 977 (Bankr.N.D.Ga.1980) (guaranty agreements are contracts to extend financial accommodations)
 
 
 [12]
 In the Matter of Wills Travel Service, Inc., 72 B.R. at 382
 
 
 [13]
 See In re Cole Brothers, 137 B.R. at 652 ("If the purpose of the executory contract is to provide financing, then the debtor should not be allowed to assume it and force the creditor to continue its obligation to provide financial benefit at its own risk. But ... when the overall agreement establishes a contractual business relationship, of which financing is only a part, the debtor should be, and is allowed to exercise its right of assumption.")
 
 
 [14]
 In re Karsh Travel, 87 B.R. at 111
 
 
 [15]
 In an amicus curiae brief, several credit card companies urge that some banks have suffered heavy losses as a consequence of excessive chargebacks. The losses described all resulted from fraud. Credit card losses can arise from fraud on the part of either a cardholder or a merchant. The former are borne by the card-issuing bank. Fraud by a merchant with respect to its merchant bank would obviously result in a termination of a credit card merchant agreement by a bankruptcy court. The argument of amici curiae, to have any validity, has to assume that a court would mandate the continuance of an executory contract with a bankrupt guilty of fraud. Such specious and dilatory arguments ill serve those who make them
 
 
 [16]
 Bankruptcy Transcript at 13
 
 
 [17]
 The MasterCard and Visa operating rules and regulations apparently are considered confidential and are not even distributed to merchants who are purportedly bound thereby. One bankruptcy court has declined to bind a merchant to the terms of these rules and regulations because the merchant had no notice of these terms. In re Standard Financial Management Corp., 94 B.R. 231, 237 (Bankr.D.Mass.1988)
 
 
 [18]
 Black's Law Dictionary 1016 (5th ed. 1979)