**In re PREMIER OPERATIONS, Debtor–in–Possession.**

**NOVA Information Systems, Inc., Appellant,**

v.

**Premier Operations, Ltd., Appellee.**

**No. 02 CIV. 6997.**

United States District Court, S.D. New York.

June 19, 2003.

---

Toni Marie McPhillips, Duane Morris, LLP, New York City, for NOVA Information Systems, Inc.

Ken Coleman, Allen & Overy, New York City, for Premier Operations, Ltd.

### DECISION AND ORDER

MARRERO, District Judge.

Appellant NOVA Information Systems, Inc. ("NOVA") appeals to this Court pursuant to 28 U.S.C. § 158(a) or (b) (the "Appeal") from an order (the "Reclassification Order") of the Bankruptcy Court (the "Bankruptcy Court") sustaining an objection by appellee Premier Operations, Ltd. ("Premier") to NOVA's amended proof of claim (the "Amended Claim"). The Reclassification Order reclassified the Amended Claim as a general unsecured claim in Premier's bankruptcy proceeding. Premier initially filed a motion in this

Court to dismiss the Appeal pursuant to 28 U.S.C. § 158(a)(3) and Federal Rules of Bankruptcy Procedure 8001(b), 8002(a) and 8003(a) (the "Motion"). In a Decision and Order dated March 7, 2003 (the "Decision")[1], the Court denied the Motion. Both parties subsequently filed briefing papers arguing the merits of the Appeal. For the reasons set forth below, the Appeal is DENIED.

### I. FACTS

The Appeal arises out of Premier's bankruptcy proceedings. Premier, a Bermuda corporation, was engaged in operating cruise ships out of Port Canaveral, Florida. Premier's customers (the "Customers") were allowed to make deposits for Premier's cruises (the "Deposits") by using Visa or MasterCard credit cards, which were issued by certain banks (the "Card–Issuing Banks"). As a merchant, Premier did not have the capability to manage such credit card charges by itself, so it entered into an agreement (the "Agreement") with First Union Bank ("First Union")[2] under which First Union processed the payment of such charges.[3] Sometime in January, 1996, First Union assigned the Agreement to NOVA, which thereby undertook to perform the underlying processing work and, *inter alia,* assumed ultimate responsibility for any reimbursements, otherwise known as "chargebacks," that might arise if a Customer did not receive the services for which she had paid. *See Nova Info. Sys., Inc.,* 2002 WL 32075792, at *1 ("Pursuant to [the Agreement], [NOVA] promised to

---

1. The Decision is reported at *In re Premier Operations, Ltd.,* 290 B.R. 33 (S.D.N.Y.2003).

2. Premier initially entered into the Agreement with Florida National Bank, which then assigned the contract to First Union.

3. In this role, First Union served as Premier's "merchant bank," which in this circumstance refers to "a member of the VISA/MasterCard system that agrees to process payments made to the merchant with those cards." *Nova Info. Sys., Inc. v. Greenwich Ins. Co.,* No. 00 Civ. 1703, 2002 WL 32075792, at *1 n. 2 (M.D.Fla. Dec. 13, 2002).

reimburse First Union for any charge-backs passed on to First Union by the card-issuing banks.").[4]

With the Agreement assigned to NOVA, a typical transaction would proceed as follows. First, a Customer would purchase a cruise or make a Deposit on a cruise, ordinarily substantially in advance of the departure date. Premier would then receive a receipt reflecting the transaction, and immediately forward the invoice to NOVA, which would credit Premier's account with the charged amount. Thereafter, NOVA would be reimbursed by the Card–Issuing Banks for such payments. The final link in the arrangement would be completed when the Card–Issuing Banks collected the charged amount from the Customer.

As with any transaction involving a merchant, the risk existed that Premier would become insolvent in the interval between receiving full or partial payment from a Customer and providing the pre-paid cruise. Pursuant to the Fair Credit Billing Act, 15 U.S.C. § 1666 *et seq.* ("FCBA") and the VISA/MasterCard regulations (the "Regulations"), the Customer in such a situation would have to be reimbursed by the Card–Issuing Bank promptly upon presenting the Card–Issuing Bank with the proper documentation. *See* 15 U.S.C. § 1666(a) & (b) (1997); *Nova Info. Sys., Inc.*, 2002 WL 32075792, at *1. The Card–Issuing Bank could in turn seek a chargeback from NOVA[5], which could pass the chargeback on to Premier unless Premier was insolvent, in which case

NOVA would bear the loss. *See id.; see also In re Thomas B. Hamilton Co., Inc.*, 969 F.2d 1013, 1015–17 (11th Cir.1992) (explaining relationship between cardholders, card-issuing banks and merchant banks in situations involving chargebacks).

In September 2000, Premier initiated a proceeding in Bermuda to liquidate its business following the seizure of one of its ships by a secured creditor. Later that month, the Bermuda court-appointed joint liquidators filed an involuntary petition against Premier in this District under § 303(b)(4) of the Bankruptcy Code. The proceeding was later converted into an action under Chapter 11 of the Bankruptcy Code and the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") in May 2001.

By Order entered on December 20, 2001, the Bankruptcy Court established a deadline of January 25, 2002 (the "Claims Bar Date") by which Premier's creditors could file written proofs of claims. In accordance with this schedule, NOVA filed a claim (Claim No. 423) on January 24, 2002 (the "Original Claim") asserting an amount owed by Premier to NOVA. The debt arose out of losses NOVA allegedly incurred as a result of actions by approximately 19,000 of the Customers who, in the wake of Premier's bankruptcy, chose to obtain chargebacks from their Card–Issuing Banks for their pre-paid cancelled cruises. Pursuant to the Agreement, after crediting the chargebacks to the Customers, the Card–Issuing Banks turned to

---

4. Throughout this decision, the Court refers to the order issued by the Middle District of Florida in *Nova Info. Sys., Inc.* In that matter, arising from the same facts as the case at bar, NOVA sued to enforce a bond issued by two sureties that allegedly provided NOVA with coverage in the event of Premier's bankruptcy. Pursuant to Fed.R.Evid. 201(b), the Court takes judicial notice of the Florida district's

*Nova Info. Sys., Inc.* opinion as a public record, *see Rothman v. Gregor*, 220 F.3d 81, 89 (2d Cir.2000), and relies on that opinion's well-developed factual record.

5. As noted above, pursuant to the Agreement, NOVA assumed First Union's ultimate responsibility for any chargebacks.

NOVA for reimbursement. NOVA claimed that in the course of these transactions, the Customers contractually assigned to NOVA all of their rights to recover their payments from Premier (the "Assignments"), and thus NOVA sought to enforce the Assignments against Premier in the bankruptcy proceeding.

On May 21, 2002 NOVA amended its Original Claim by filing a proof of claim (Claim No. 535) (the "Amended Claim") asserting a secured claim in the amount of $260,498.10 and an unsecured claim of $9,707,826.90, of which NOVA stated $6,360,505 was entitled to priority status pursuant to § 507 of the Bankruptcy Code (" § 507"). On July 1, 2002, Premier filed an objection (the "Objection") to NOVA's Amended Claim on the ground that NOVA was not an assignee, but rather a subrogee of the Customers' claims, and consequently, pursuant to § 507(d),[6] precluded from asserting priority on any portion of its unsecured claim. NOVA responded to the Objection in a brief filed with the Bankruptcy Court on July 26, 2002, and Premier replied with its own brief on July 30, 2002 (the "Reply Brief").

On July 31, 2002, the Bankruptcy Court heard arguments on the matter from both parties and from counsel for the Committee (the "Hearing"). The Bankruptcy Court then ruled in favor of Premier, sustaining the Objection by Order dated July 31, 2002, and entering the Reclassification Order, which reclassified the Amended Claim as an unsecured non-priority claim. In response, NOVA filed a Notice of Appeal (the "Notice of Appeal") with the Clerk of the Bankruptcy Court on August 12, 2002, and subsequently filed an amend-

ed notice of appeal ten days later to correct errors in the Notice of Appeal. Premier moved to dismiss the Appeal. In its Decision, this Court denied the Motion and ordered the parties to brief the merits of the issues on appeal.

## II. DISCUSSION

### A. STANDARD OF REVIEW

A district court's jurisdiction to review appeals from bankruptcy court orders is governed by 28 U.S.C. § 158(a), which grants jurisdiction for a district court to hear an appeal from a bankruptcy court's final judgment, order or decree. In its Decision, this Court held that the Reclassification Order was a final order as defined under § 158(a), and thus the Court had jurisdiction to hear the Appeal. *See In re Premier*, 290 B.R. at 45.

On an appeal from a bankruptcy court's final order, the district court reviews the bankruptcy court's findings of facts for clear error. *See In re Adler, Coleman Clearing Corp.*, 263 B.R. 406, 423 (Bankr.S.D.N.Y.2001). By contrast, a de novo standard of review applies to questions of law. *See In re AroChem Corp.*, 176 F.3d 610, 620 (2d Cir.1999). In regards to mixed questions of law and fact, the Court must review findings of fact under the clearly erroneous standard and the conclusions of law de novo. *See In re United States Lines, Inc.*, 197 F.3d 631, 640–41 (2d Cir.1999).

Here, the Bankruptcy Court, in rejecting NOVA's priority claim and issuing the Reclassification Order, noted that:

> ... I do find that [the Assignments] are not the true assignments as such. The

---

6. Section 507(d) provides in pertinent part that:

"[a]n entity that is subrogated to the rights of a holder of a claim of a kind specified in subsection ... (a)(6) ... of this section is

not subrogated to the right of the holder of such claim to priority under such subsection."

11 U.S.C. § 507(d).

label is really exalting form over substance. I agree with the position taken by the Creditors' Committee and the Debtor that what Nova has … obtained by way of assignment, if it obtained anything, is the subrogation right of the banks or the subrogation position of the banks, which is a position of a subrogee, and comes clearly under the provisions of 507(d).

(Transcript of Objection to Claims Hearing, dated July 31, 2002, attached as Exhibit 8 to Appendix Volume 1 to Brief of Appellee Premier Operations Ltd., Debtor ("App. Volume 1"), at 35.)

The parties disagree as to whether the Reclassification Order contained only conclusions of law, or both findings of fact and conclusions of law. As is evident from the statement quoted above, there is substantial overlap and a gossamer border between factual and legal issues embodied in the Bankruptcy Court's ruling. However, as demonstrated in the Court's opinion below, the Court's conclusions are not affected by the standard of review it uses. Therefore, the Court will apply the stricter dè novo standard in considering any borderline matters.

## B. *PROCEDURAL DISPUTES*

Before proceeding to the substantive issues in this matter, the Court shall address NOVA's two procedural objections to Premier's arguments before the Bankruptcy Court. First, NOVA objects to Premier's challenge of the enforceability of the Assignments. NOVA contends that Premier did not raise this objection—which claims that NOVA could not assert the priority status of the Assignments because the Assignments themselves were not valid—until Premier filed its Reply Brief one day before the Hearing. NOVA asserts that the injection of such a last-minute argument violated clear procedural rules that forbid raising new arguments in reply briefs.

It is well-established that motions must be made in a party's initial moving papers, not in its reply brief. *See U.S. v. Yousef,* 327 F.3d 56, 115 (2d Cir.2003) ("We will not consider an argument raised for the first time in a reply brief."); *In re New York Trap Rock Corp.,* 155 B.R. 871, 878 n. 3 (Bankr.S.D.N.Y.1993) ("The court will not consider the Defendants' request[s] … as these objections were raised for the first time in the Defendants' reply brief."). However, Premier contends that the arguments raised in the Reply Brief addressed arguments made by NOVA in its response to the Objection.

The Court agrees. NOVA's entire argument hinges on the validity of the Assignments that the Customers allegedly made to NOVA. While Premier may not explicitly challenge such validity in the Objection, its comment that "credit card companies' rights against a debtor business are those of 'subrogee' rather than 'assignee' " raises the question of whether a credit card company can ever receive an assignment from a credit card holder. (Objection, attached as Exhibit 5 to App. Volume 1, at 4.) Indeed, the Court is not clear how it could evaluate whether NOVA is a true assignee without considering the enforceability of the Assignments. Moreover, NOVA's response to the Objection argues that § 507(d) does not apply to contractually assigned claims, which raises the issue of whether the claims could be assigned and, if so, whether they were properly assigned. Thus, the Court is persuaded that Premier's discussion of the enforceability of the Assignments in its Reply Brief is not inappropriate.

NOVA also argues that Premier lacked any standing to challenge the en-

forceability of the Assignments.[7] NOVA is correct that a debtor does not have standing to object to the assignment of bankruptcy claims. *See In re Lynn*, 285 B.R. 858, 859 (Bankr.S.D.N.Y.2002). However, by arguing that the Assignments do not confer assignee status on NOVA as required to avoid a finding of subrogation under § 507(d), Premier was not asking the Bankruptcy Court to rule that the Assignments were made improperly or to invalidate them. *See id.* (debtor moved for court to invalidate assignment of claim on the ground that assignee engaged in champerty). Rather, Premier asked the Bankruptcy Court to rule that the Assignments did not qualify as assignments as needed to avoid subrogation under § 507(d). *See id.* (noting that debtor has standing "to object to [assignee's] *exercise* of a creditor's rights that may aggrieve him"). The propriety of Premier's challenge is bolstered by the significant precedent, much of it cited by NOVA, in which debtors properly object to the purported assignments of claims by contending that such assignments did not allow the assignee to avoid the enforcement of § 507(d). *See, e.g., In re Missionary Baptist Found. of Am., Inc.*, 667 F.2d 1244, 1244 (5th Cir. 1982); *In re P.J. Nee Co.*, 36 B.R. 609, 611 (Bankr.D.Md.1983).

Because the Court finds neither of NOVA's procedural objections to be meritorious, it need not address Premier's opposition to NOVA raising such procedural objections.

### C. NOVA'S ALLEGED SIXTH PRIORITY CLAIMS

■ Commercial entities that become bankrupt often do so because they are unable to generate sufficient proceeds to sustain the costs of doing business, and it logically follows that in bankruptcy, these companies would be unable to fully satisfy all of the claims filed by creditors who are entitled to payment. Through the Bankruptcy Code, Congress created an order of priority that allowed the claims of certain creditors to be paid in full before those of other creditors. *See* 4 *Collier on Bankruptcy* ("*Collier*") ¶ 507.02[1] (Lawrence P. King ed.2002), at 507–13. Out of the nine priorities designated by Congress, the instant case concerns the sixth priority, codified in 11 U.S.C. § 507(a)(6)[8], which was designed "to protect consumers who make deposits for goods or services with the debtor that were not provided to the consumers at the time the debtor filed for bankruptcy." *Id.* ¶ 507.08, at 507–48.

Premier asserts that NOVA is "subrogated" to the Customers' sixth priority claims and that § 507(d) therefore precludes priority treatment, even though the underlying claims would have been entitled to priority under § 507(a)(6) had they been made by the Customers themselves. NOVA, in contrast, argues that § 507(d) does not prevent priority treatment of its claims, on the theory that it is an "assignee," rather than a "subrogee," of the Customers' claims, and therefore entitled to the same priority treatment that the Customers would have had.

7. In addition, NOVA contends that Premier's argument that the Assignments are unenforceable is factually unsupported by the record, but the Court defers discussion of this issue until later in this opinion.

8. 11 U.S.C. § 507(a)(6) provides:
(6) Sixth, allowed unsecured claims of individuals, to the extent of $2,100 for each such individual, arising from the deposit, before the commencement of the case, of money in connection with the purchase, lease, or rental of property, or the purchase of services, for the personal, family, or household use of such individuals, that were not delivered or provided.

■ Section 507(d) bars a subrogee of a § 507(a)(6) claim from stepping into a priority position, but permits an assignee to assert such a claim in certain circumstances. *See In re All Am. Mfg. Corp.,* 185 B.R. 79, 80 (Bankr.S.D.Fla.1995); 4 *Collier* ¶ 507.14, at 507–93 ("While subrogees cannot assert the priority of an assigned claim under section 507(d), assignees are not subject to the same limitation."). In distinguishing between a subrogee and an assignee, the Court is guided by precedent that has addressed similar situations.

*In re P.J. Nee* involved a bank which had a member agreement with a furniture company, P.J. Nee, under which the bank's credit card customers could use their bank-issued credit cards to make purchases of or deposits on furniture from P.J. Nee. 36 B.R. 609, 611 (Bankr.D.Md. 1983). When P.J. Nee filed for Chapter 7 bankruptcy, the bank's customers availed themselves of certain Consumer Credit Protection laws [9] that allowed the customers to receive chargebacks from the bank. The bank then attempted to assert a first priority claim under 11 U.S.C. § 507(a)(1), which grants such priority for administrative expenses. The bank contended that the administrative expense in question was its refunding of the deposits made through its credit cards to P.J. Nee's customers.

The bankruptcy court disagreed, finding that no assignment by the customers of their § 507(a)(6) claims [10] had taken place. Rather, the bankruptcy court found that the bank had reimbursed the customers as it was obligated to do pursuant to the consumer protection laws, and therefore the bank was "a surety of the performance of the retail merchant." *Id.* at 611. The

bankruptcy court viewed the bank's dilemma as a cost of doing business, and was not convinced that this financial risk fell under the public policy mandate to protect consumers as set forth by § 507(a)(6).

NOVA attempts to distinguish its situation from that entailed in *P.J. Nee* by arguing that the federal consumer protection laws cited in *P.J. Nee* do not apply to NOVA because NOVA does not issue credit cards, but rather serves as an intermediary between merchants and card issuers. The Court finds this distinction unpersuasive and irrelevant. The holding in *P.J. Nee* did not apply solely to companies covered by the specified consumer protection laws, but rather to any corporate entity that was required by law "to vindicate the rights of its own client . . . ." *Id.* at 612. Because the bank in *P.J. Nee* had "upheld its contract obligations not by any moral judgment, but because the law compelled it to do so," *id.,* the bankruptcy court asserted that the bank did "not stand in the shoes of the consumer, but rather as an unwilling creditor in its own right." *Id.* at 611. Indeed, the bankruptcy court noted that, to protect itself, the bank could have required a bond from P.J. Nee before it entered into the member agreement, but chose not to do so. *See id.* The bankruptcy court concluded that "[h]aving taken that business risk in entering into the relationship with P.J. Nee, why should [the bank] be placed ahead of all other unpaid suppliers?" *Id.* at 612.

This principle prevails in a series of similar cases involving creditors who reimbursed consumers and later sought assignee status. When the creditors made such reimbursements due to legal or contractual

---

9. These laws are codified in Chapter 41 of Title 14 of the U.S.Code, 15 U.S.C. § 1601, *et seq.* and the implementing regulations in 12 CFR Part 226.

10. The *P.J. Nee* court's opinion refers to the consumer priority claims as § 507(a)(5) claims, which were what such claims were codified as at the time the case was decided.

obligations, the courts did not find them to be assignees. *See, e.g., Creditor's Comm. v. Commonwealth of Mass., Dep't of Revenue,* 105 B.R. 145, 148–49 (D.Mass.1989) (finding that an insurance company's claim was subrogated because it was obligated to make payments pursuant to surety bond); *In re Mel–Hart Products, Inc.,* 156 B.R. 606, 607 (Bankr.E.D.Ark.1993) (finding that a company was not an assignee of its employees' wage obligations because it "was obligated to pay the employees under the contract between [the company] and the debtor and pursuant to a contract between the employees and [the company]."); *In re Mid–Am. Travel Serv., Inc.,* 145 B.R. 969, 972 (Bankr.E.D.Ark.1992) (finding that a bank's claim "arises from subrogation rather than assignment" because the bank "did not act voluntarily when it 'reversed' the credit card holders' charges, but [rather] was required by law to credit the accounts in the amounts of the disputed claims."); *In re Ted True, Inc.,* 94 B.R. 423, 427–28 (Bankr.N.D.Tex.1988) (finding a company's claim to be subrogated because applicable "payments were made under compulsion from the State Comptroller").

However, when the creditors made such reimbursements voluntarily rather than under compulsion of legal or contractual obligations, the creditors were considered assignees. *See, e.g., In re Missionary Baptist,* 667 F.2d at 1246–47 (finding that a supermarket that voluntarily cashed customers' payroll checks was an assignee of customers' bankrupt employer); *In re All Am. Mfg. Corp.,* 185 B.R. at 81 (finding that a check cashing agency was a "voluntary assignee" of claims of customers who cashed their payroll checks from a company that later went bankrupt because the agency "was under no legal or contractual obligation to cash the Debtor's payroll checks for the employees, and had no interest in the transactions between the Debtor and employees."); *In re A.D.S.T., Inc.,* 169 B.R. 64, 66 (Bankr.D.Idaho 1994) (finding that a market which cashed customers' payroll checks to be assignee of customers' claims because market "was under no legal obligation to cash the employee's payroll checks, and was acting as a volunteer in doing so."); *In re Paris Indus. Corp.,* 95 B.R. 258, 259 (Bankr. D.Maine 1989) (finding that company was an "unconditional assignee" of claims of employees for vacation pay because it "was under no legal compulsion to pay the employees."); *see also* 4 *Collier* ¶ 507.14, at 507–94 ("The key distinction between a subrogee and an assignee is that a subrogee acquires the claim because the subrogee . . . had a legal or contractual duty to the original claim holder to pay the obligation. An assignee, in contrast, is under no obligation of any sort to acquire the claim from the original claim holder and acquires the claim through a voluntary transaction.").

Such a judicial policy aims to distinguish between creditors who assume the rights and liabilities of the consumer on a negotiated basis for consideration paid directly to the consumer and creditors who assume the consumers' claims unwillingly by operation of other contractual or legal obligations not necessarily flowing from a relationship between the customer and the creditor. In the latter situation, as illustrated by the instant case, the customer may already have been made whole by other parties—for instance, as here, the Card–Issuing Bank—and thus may have no claim left that could be validly assigned. Moreover, again as here exemplified by the contractual relationships established among the parties pursuant to the Agreement, a creditor such as NOVA is already entitled under its business arrangement with the debtor to pass on to and ultimately seek reimbursement directly from the

debtor with respect to any chargebacks the creditor pays to third parties such as credit card companies. Such a creditor, unlike the voluntary assignee, ordinarily would not only not enter into a direct relationship with the customer in order to acquire reimbursement rights that may be pressed against the debtor, but in fact, by virtue of the pre-existing contractual obligations between creditor and debtor referred to, would not really need to contract with customers for this purpose. Accordingly, a purported "assignment" of reimbursement rights by a customer, especially one whose charge has already been repaid, to such creditors may amount to nothing more than a gratuitous, supernumerary gesture that generally appears contrived after the fact so as to convert the subrogee into an assignee, and thereby enable that creditor to assert a right to step into the customer's shoes in claiming the corresponding higher priority in bankruptcy proceedings. Thus, the distinction between subrogees and assignees implicitly recognizes, as the *P.J. Nee* court observed, that by reason of the subrogees' unwilling assumption of duties, they may have another party to whom they may look for reimbursement, or are otherwise better positioned to assess, accept and protect against business risks than the voluntary assignee.

Applying this policy to the instant case, the Court is persuaded that NOVA's claims should be treated as deriving from a subrogation rather than an assignment of the Customers' rights. NOVA did not reimburse the Customers voluntarily, but instead was legally obligated to do so be-cause of some combination of the FCBA, the Regulations and the Agreement.[11] As a result, NOVA is exactly the type of "unwilling creditor" to whom previous courts have refused to assign the protections of § 507(a)(6).

■ NOVA argues that it should assume the same priority as the Customers because the Assignments provided NOVA with all of the rights of the Customers to demand reimbursement from Premier. However, it is not enough for NOVA to present documents that by title and form superficially appear to assign the Customers' rights. Instead, it is the responsibility of a bankruptcy court determining the rights of a party against a bankruptcy estate to "look through the form to the substance in determining the true nature of the transaction in question." *In re Wingspread Corp.*, 145 B.R. 784, 788 (S.D.N.Y.1992); *see also Pepper v. Litton,* 308 U.S. 295, 304, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *Creditor's Committee,* 105 B.R. at 149 n. 5.

In the instant case, the Bankruptcy Court fulfilled this responsibility, and concluded that NOVA's Assignments were "form over substance" and thus did not qualify as true assignments. The Court is persuaded that the Bankruptcy Court was correct in drawing this conclusion. First, NOVA was found to be legally required to reimburse the Customers, and therefore "there was no consideration to support the purported assignment." *In re Mid–Am.,* 145 B.R. at 972 (finding a purported assignment to be invalid for lack of consideration because the bank was already liable

---

11. NOVA claims it is not subject to the FCBA because it is not a "card-issuing bank," and that the Regulations provide some discretion to NOVA to withhold reimbursement if there is a question about the validity of a Customer's claim. Even if the Court were to accept these contentions, NOVA has offered no evi-dence to demonstrate that it is not legally bound to reimburse the Customers based on its contractual obligations in the Agreement, and the Court finds nothing clearly erroneous with the Bankruptcy Court's finding of fact that NOVA was legally obligated to pay the reimbursements.

"by virtue of nonbankruptcy law prior to the execution of" the assignments); *see also In re Mel–Hart*, 156 B.R. at 607 ("There can be no assignment from employees to [claiming company] because there was no consideration to support the purported assignment.").

In addition, the factual record that the Bankruptcy Court relied on indicates that NOVA acquired the Assignments after the Customers had received their chargebacks, meaning that even assuming the Customers and NOVA could have engaged in a consensual assignment of the Customers' rights, the Customers had nothing to assign by the time they executed the Assignments. *See Nova Info. Sys., Inc.*, 2002 WL 32075792, at *11 (finding that "the undisputed facts show that the assignments occurred after [NOVA] had honored all chargebacks" and thus there was "nothing to assign."). The fact that another district court, reviewing an even more extensive factual record, reached the same conclusion only bolsters the Bankruptcy Court's findings.

NOVA avers that the chargebacks received by the Customers prior to the execution of the Assignments were only provisional because NOVA still had certain rights under the Regulations to reverse the chargebacks. This argument lacks merit. NOVA has failed to provide the Court with copies of the applicable provisions of the Regulations or to offer any other evidence to support this argument. *See In re Thomas B. Hamilton*, 969 F.2d at 1022. Indeed, such an unusual arrangement would likely be discussed in the Agreement which obligated NOVA to cover any chargebacks, but no such reference is highlighted by NOVA. *See id.* (finding bank's claim that reimbursements were provisional to be "inconceivable . . . absent some indication of such an arrangement in the Agreement."). Moreover, NOVA's argument was heard and rejected by the Bankruptcy Court, and considering the lack of evidence submitted by NOVA to support the argument, the Court is not persuaded that the Bankruptcy Court's finding of fact on this matter was clearly erroneous.

In light of the foregoing reasoning, the Court also rejects NOVA's final argument that Premier engaged in misconduct by failing to list, on the schedules filed with the Bankruptcy Court, the Customers as holding priority claims. NOVA complains that this failure to specifically list the Customers prevented NOVA from securing the Assignments and asserting priority claims against Premier's bankruptcy estate on a timely basis. However, the Court has already ruled that NOVA was legally incapable of receiving an Assignment from a Customer and asserting such an Assignment pursuant to § 507(a)(6). Thus, the Court is not persuaded that Premier's behavior with regard to the listing of the Customers on the bankruptcy schedules had any material impact on NOVA's priority status.

## III. *ORDER*

For the reasons described above, it is hereby

**ORDERED** that appellant NOVA Information Systems, Inc.'s appeal from the Reclassification Order of the Bankruptcy Court is DENIED.

The Clerk of Court is directed to close this case.

**SO ORDERED.**