**In re BEST PRODUCTS COMPANY, INC., Debtor-in-Possession.**

**Bankruptcy No. 96–35267–T.**

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

June 2, 1997.

---

·H. Slayton Dabney, Douglas M. Foley, McGuire, Woods, Battle & Boothe, Richmond, VA, for Debtor.

Debra L. Fletcher, Womble, Carlisle, Sandridge & Rice, Charlotte, NC, for Bank One.

Bruce H. Matson, Paula Beran, LeClair Ryan, Richmond, VA, for Official Committee of Unsecured Creditors.

## *MEMORANDUM OPINION*

DOUGLAS O. TICE, Jr., Bankruptcy Judge.

On January 30, 1997, Bank One filed a motion requesting that the court treat certain damages incurred under a private label revolving credit plan agreement as an administrative expense pursuant to 11 U.S.C. §§ 507(a)(1) and 503(b)(1)(A). On March 3, 1997, the debtor moved to dismiss Bank One's motion pursuant to Fed. R. Bankr.P. 9014 and 7012. Having held a hearing on the debtor's motion to dismiss on April 11, 1997, and for the reasons set forth below, the court will grant the debtor's motion and will dismiss the motion for administrative priority filed by Bank One.

### Findings of Undisputed Fact and Procedural History

The debtor is a publicly owned corporation which, until late in the autumn of 1996, operated 11 jewelry stores and 169 large retail outlets in shopping centers and malls throughout the country. On July 26, 1996, the debtor and Bank One entered into a private label revolving credit plan agreement with a term of three years. Pursuant to this contract, Bank One issued to individual consumers a private label credit card which bore the debtor's trade name (the "BestCard") and which could be used to purchase merchandise at any store operated by the debtor. When a customer charged a product to the BestCard, the debtor retained a sales draft identifying the transaction and signed by the customer. The debtor then forwarded this sales draft to Bank One, which in turn paid to the debtor and posted to the customer's account a sum equal to the face amount of the draft.

Under the terms of the agreement, Bank One undertook every duty associated with administering the BestCard and collecting the amounts owed by each customer. If any particular account could not be collected, Bank One agreed to bear the entire loss. Bank One, however, did retain the right to "charge back" to the debtor the sales draft for any transaction which involved a billing error, a service or merchandise dispute, or a material and uncured failure by the debtor to comply with "Addendum D" to the contract. In addition, Bank One had the prerogative, "at its sole election, [to] terminate this Agreement by written notice to the [debtor], which notice is waived by and need not be given if the termination is due to the filing of a petition pursuant to any chapter of the Bankruptcy Code." (Private Label Revolving Credit Plan Agreement dated July 12, 1996, at 13.)

On September 24, 1996, the debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code. Although Bank One purportedly advised the debtor that their agreement would have to be modified to address the potential for extraordinary losses, the parties continued to do business as they had in the past. On October 17, 1996, however, Bank One moved for relief from the automatic stay in order to terminate the agreement. On October 24, 1996, the court entered a fully endorsed consent order granting Bank One's motion and terminating the agreement effective October 27, 1996.

On January 30, 1997, Bank One filed the pending motion for administrative priority. According to its records, Bank One extended $8,867,612.59 in credit to the debtor's customers between the petition date and October 27, 1996. At the time the motion was filed, Bank One projected an increase in the "uncollectible accounts" rate on the BestCard from 11.87% prepetition to 18.98% post-petition. This 7.11% increase translates into an additional $1,683,073.00 which Bank One will not be able to collect from individual customers and for which Bank One seeks to be compensated from the bankruptcy estate.

### Discussion and Conclusions of Law

Bank One thus requests an award of $1,683,073.00 in administrative expenses pursuant to 11 U.S.C. §§ 507(a)(1) and 503(b)(1)(A).[1] On March 3, 1997, the debtor moved to dismiss this motion for administrative priority under Fed. R. Bankr.P. 7012 and Fed.R.Civ.P. 12(b)(6). Fed. R. Bankr.P. 9014, which dictates the procedure to be followed in contested matters, provides in pertinent part:

> The motion shall be served in the manner provided for service of a summons and complaint by Rule 7004, and, unless the court otherwise directs, the following rules shall apply: 7021, 7025, 7026, 7028–7037, 7041, 7042, 7052, 7054–7056, 7062, 7064, 7069, and 7071. The court may at any stage in a particular matter direct that one or more of the other rules in Part VII shall apply.

Finding the debtor's motion to offer an opportunity to resolve the parties' dispute expeditiously, the court will employ Fed. R. Bankr.P. 7012 and Fed.R.Civ.P. 12(b)(6) in this matter.[2]

Bank One's argument begins with the premise that the private label revolving credit plan agreement constituted a "financial accommodation" under 11 U.S.C. §§ 365(c)(2) [3] and (e)(2)(B) [4] which the debtor could not assume and which Bank One could terminate when the debtor filed its bankruptcy petition. Bank One contends, however, that the automatic stay precluded it from unilaterally terminating the agreement until the court granted the motion for relief on October 24, 1996. Since the debtor refused to waive its rights during the interim, Bank One purportedly had no alternative but to continue to extend credit post-petition. This position, into which Bank One was apparently forced by the debtor, resulted in extraordinary costs which benefitted the estate and for which Bank One is entitled to an administrative claim.

■ The first issue which the court must resolve, then, is whether the private label revolving credit plan agreement constituted a "financial accommodation" under 11 U.S.C. §§ 365(c)(2) and (e)(2)(B). Although the Bankruptcy Code does not define the term, courts have agreed that it should be strictly construed. *See Citizens & So. Nat'l Bank v. Thomas B. Hamilton Co. (In re Thomas B. Hamilton Co.),* 969 F.2d 1013, 1018 (11th

---

1. Section 507(a)(1) gives first priority to "administrative expenses allowed under section 503(b)." Section 503(b)(1)(A), in turn, allows as an administrative expense "the actual, necessary costs and expenses of preserving the estate...."

2. Of course, when considering the debtor's motion to dismiss for "failure to state a claim upon which relief can be granted," the court must accept all the allegations in Bank One's motion as true, must construe that motion in a light most favorable to Bank One, and must determine whether Bank One might be entitled to relief under any reasonable reading of its motion. *Smith v. Richels (In re Richels),* 163 B.R. 760, 762 (Bankr.E.D.Va.1994); *Broad St. Assocs. v. United Cos. Life Ins. Co. (In re Broad St. Assocs.),* 163 B.R. 68, 69 (Bankr.E.D.Va.1993); *see also Estate Constr. Co. v. Miller & Smith Holding Co.,* 14 F.3d 213, 218 (4th Cir.1994).

3. Section 365(c)(2) provides: "The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—

   (2) such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor."

4. Section 365(e)(2)(B) provides that an executory contract may be terminated or modified solely because of a provision conditioned on the filing of a bankruptcy petition if that contract "is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor."

Cir.1992); 3 *Collier on Bankruptcy* ¶ 365.06[2] (Lawrence P. King et al. eds., 15th ed. rev. 1997). Indeed, the legislative history appears to support such an approach: "Characterization of contracts to make a loan, or extend other debt financing or financial accommodations, is limited to the extension of cash or a line of credit and is not intended to embrace ordinary leases or contracts to provide goods or services with payments to be made over time." 124 Cong. Rec. H11089 (daily ed. Sep. 28, 1978) (statement of Rep. Edwards), *reprinted in* 1978 U.S.C.C.A.N. 6436, 6447 (1978); 124 Cong. Rec. S17406 (daily ed. Oct. 6, 1978) (statement of Sen. DeConcini), *reprinted in* 1978 U.S.C.C.A.N. 6505, 6515 (1978). Therefore, while a contract "for which the extension of credit is the primary purpose" may be deemed a financial accommodation under §§ 365(c)(2) and (e)(2)(B), one "in which the extension of credit is only incidental to or a part of a larger arrangement involving the debtor" cannot be so classified. *In re Thomas B. Hamilton Co.*, 969 F.2d at 1019.

This matter presents a rather unusual situation, insofar as Bank One provided financing not under the private label revolving credit plan agreement but under its contract with each customer who applied for a Best-Card. The court notes that, in nearly every instance where a financial accommodation has been found to exist, the debtor has been directly or secondarily liable for the debt incurred. *See John Deere Co. v. Cole Bros., Inc. (In re Cole Bros., Inc.)*, 154 B.R. 689 (W.D.Mich.1992) (finding a financial accommodation where the debtor dealer obtained direct financing under a floor plan arrangement with its supplier); *Transamerica Commercial Fin. Corp. v. Citibank, N.A. (In re Sun Runner Marine, Inc.)*, 945 F.2d 1089 (9th Cir.1991) (finding a financial accommodation where the debtor manufacturer guaranteed loans made to its dealers). In this matter, however, the debtor assumed no such obligation under the credit card agreements executed by Bank One and individual consumers. Indeed, the only instance in which Bank One could turn to the debtor for recompense under the private label revolving credit plan agreement arose when the fault for a customer's charge back lay with the debtor itself.

The decision in *Hamilton* is precisely on point. The debtor in that case was a merchant in the business of buying and selling finished sterling silver products on the retail level. In April 1980, the debtor and its bank entered into a credit card merchant agreement under which the debtor promised to honor MasterCard and Visa charge cards tendered by customers in the ordinary course of business and the bank promised to purchase the sales drafts generated by these transactions. In practice, each time a sales draft was released to the bank, the debtor simultaneously transmitted data regarding the underlying transaction to MasterCard or Visa. MasterCard or Visa, in turn, forwarded the data to the lending institution which had issued the credit card. The card-issuing bank then transferred the funds, via the MasterCard or Visa settlement process, to the debtor's bank and billed its cardholder for the sale. This process effectively reversed itself whenever a customer discovered a valid billing error and charged back the purchase. In such an instance, the debtor's bank bore the loss, with any recourse against the debtor defined by the terms of their agreement. If the customer had no right to a charge back the purchase or simply failed to pay off the account, however, the card-issuing bank alone bore the loss.

The Court of Appeals for the Eleventh Circuit found the overriding purpose of this credit card merchant agreement to be, not financing, but the "exchange of items." *In re Thomas B. Hamilton Co.*, 969 F.2d at 1020. In other words, the parties sought to create "a relationship that [would] permit [the debtor] to accept the use by customers of credit cards instead of cash in the course of its business and permit [the bank] to purchase the sales drafts arising from the resulting credit card transactions." *Id.* In fact, other than the bank's incidental right to charge back a sales draft in certain limited circumstances, "the specific terms of the Agreement [did] not evidence any intent on the part of [the bank] to extend credit to [the debtor]." *Id.* The court thus concluded that the agree-

ment did not constitute a financial accommodation under §§ 365(c)(2) and (e)(2)(B).

The appellate court made a point to emphasize that "[s]ound policy considerations support this conclusion," particularly since "[t]he Agreement at issue here is typical of credit card merchant agreements between all kinds of merchants and merchant banks." *Id.* "If these agreements may not be assumed by the trustee following a bankruptcy filing, rehabilitation will be virtually impossible for any merchant who relies heavily on credit card sales." *Id.* Though acknowledging that the level of risk initially accepted by the bank might increase when the merchant files for bankruptcy, the court found two provisions in the Bankruptcy Code to provide adequate protection against "the forced assumption of unreasonable risks." *Id.* at 1021. First, bankruptcy courts have the authority to refuse to "approve the assumption of a credit card merchant agreement [under § 365(a)] if the merchant bank demonstrates that continued performance of the agreement would place it at unreasonable risk, such as when the merchant's sales result in an unusually high percentage of chargebacks or when there is some evidence that the merchant is involved in fraud." *Id.* Second, "a merchant who has not promptly repaid chargebacks in accordance with the credit card merchant agreement may not assume the agreement [under § 365(b)] without first curing the default and providing assurance that it can and will promptly repay chargebacks in the future." *Id.*

Notwithstanding the position articulated in *Hamilton,* Bank One contends that the contract in this matter constituted a financial accommodation made to the debtor's customers *for the benefit of* the debtor. While the private label revolving credit plan agreement did detail the manner in which Bank One and the debtor would "exchange items" (sales drafts for funds), these provisions existed only to further the purpose of financing a qualified customer's purchase of merchandise sold or services rendered by the debtor. (*See* Private Label Revolving Credit Plan Agreement dated July 12, 1996, at 1.) In other words, while Bank One and the debtor entered into a "trade" relationship, their rea-

son for doing so was to create a mechanism by which credit could be extended to third parties. In this way, Bank One could profit from the interest generated when customers chose to pay for their purchases over time, and the debtor could benefit from the increase in sales which credit so often seems to prompt.

■ This argument, however, misses the point. The purpose of §§ 365(c)(2) and (e)(2)(B) is quite simple—to prevent a debtor's financial uncertainty, which necessarily results when a bankruptcy petition is filed, from unfairly elevating the risk to a party who extended credit pre-petition. Within the narrow context of this particular dispute, however, the debtor's ability to fulfill its obligations under the private label revolving credit plan agreement never concerned Bank One. Rather, Bank One has complained that the customers to whom it unilaterally chose to extend credit have breached their credit card agreements—agreements to which the debtor was not a party and over which the debtor had no control. Congress simply did not intend §§ 365(c)(2) and (e)(2)(B) to remedy this kind of collateral damage created when any retail debtor seeks relief under the Bankruptcy Code.

The court therefore concludes that the private label revolving credit plan agreement did not constitute a "financial accommodation" under 11 U.S.C. §§ 365(c)(2) and (e)(2)(B). As a consequence, Bank One was obligated to continue performing under the agreement, and to continue bearing the loss if any particular account could be neither collected from the customer nor "charged back" to the debtor, until its motion for relief from stay was granted effective October 27, 1996. Bank One thus has no ground upon which to argue that the cost of the post-petition increase in the "uncollectible accounts" rate on the BestCard should be shifted to the bankruptcy estate and treated as an administrative expense.

A separate order will be entered dismissing Bank One's motion for an award of $1,683,073.00 in administrative expenses pur-

suant to 11 U.S.C. §§ 507(a)(1) and 503(b)(1)(A).