**In re NEUHOFF FARMS, INC., Debtor.**

No. 99–05869–8–JRL.

United States Bankruptcy Court,
E.D. North Carolina,
Wilson Division.

April 26, 2000.

Trawick H. Stubbs, Jr., Stubbs & Perdue, P.A., New Bern, NC, for plaintiff.

Jeffrey H. Simcox, Hatfield, Inc., Hatfield, PA, for defendant.

### ORDER

J. RICH LEONARD, Chief Judge.

This matter comes before the court on the creditor's motion to direct the debtor to reject an executory contract, lift the automatic stay and pay an administrative expense. An extensive evidentiary hearing was held on March 15 and 16 and April 4, 2000, the first two dates in Wilson, North Carolina and the last date in New Bern, North Carolina. For the following reasons, the motion is denied.

### Facts

Debtor filed a chapter 11 petition on October 1, 1999. Since that time, the debtor has operated under its executory contract with Hatfield Quality Meats, Inc. ("Hatfield"), originally executed on January 9, 1995 and known by all parties as the "hog partnership agreement." Under this agreement the debtor supplies Hatfield with approximately 200,000 market hogs per year. Subsequent to filing this motion on November 23, 1999, but before this hearing, Hatfield renewed the contract pursuant to the original agreement terms. By a letter dated December 23, 1999, Hatfield extended the agreement for an additional five year term upon expiration of the initial five year term on January 8, 2000. The hearing on this motion was originally set for December 7, 1999, but was continued to January 12, 2000 and finally March 15, 2000 upon oral motions by Hatfield. Thus, Hatfield is asking this court to force the rejection of an executory contract that it has renewed and extended during continuances it requested.

The underlying reason that Hatfield seeks to force the debtor to reject is the hypothetical deficit ledger amount accumulated under the agreement. Currently, as stated in this court's order of February 24, 2000,[1] the deficit amount of over five (5) million dollars is a contingent liability that may never materialize into an actual claim. Essentially, as long as the debtor continues to perform under the terms of the agreement, Hatfield has no claim.[2] If the

1. That order estimated Hatfield's contingent claim in the amount of zero pursuant to 11 U.S.C. § 502(c)(1). Hatfield moved to reconsider, but because the debtor will not be forced to reject, reconsideration is not warranted.

2. As stated in the order entered on February 24, 2000, "[a]ccording to the terms of the

debtor, though, must reject this executory contract because it is barred from assuming it pursuant to 11 U.S.C. §§ 365(c)(1) or (c)(2), then the debtor would be in breach and the deficit amount would transform into an actual cognizable claim against the bankruptcy estate.

Under the pertinent provisions of the hog partnership agreement, Hatfield purchases market hogs from the debtor within a window range of prices per pound. This is the "window ledger" feature. When market prices are lower than the "floor" of the window range, a portion of the amount that Hatfield pays to the debtor which is over and above the going market price is tracked in the deficit ledger account, also called the negative cash balance.[3] It is by way of this pricing mechanism that a deficit ledger of over five (5) million dollars has accumulated. Post-petition, the debtor has continued to deliver and Hatfield has continued to purchase the market hogs under this agreement, contributing to a growing accumulation of the deficit amount due to the current state of the hog market.[4]

In addition to the contractual relationship with the debtor, Hatfield purchases from numerous other hog producers. In fact, the debtor supplies Hatfield with approximately only ten percent (10%) of its hog requirements on an annualized basis, yet the debtor is Hatfield's largest single supplier. Hatfield asserts that this agreement is important because it provides for flexibility in shipping and receiving. More pertinently, though, the agreement is a hedge on the fluctuating hog market. On the one hand, Hatfield gets a steady yet flexible flow of product from a reliable supplier, while the debtor is guaranteed to receive a price per pound within the window range, lessening the effect of market downturns and providing for steady growth. Conversely, in prosperous market times, Hatfield and the debtor split the amount that accumulates when the going market price is higher than the "ceiling" contract price.[5] In contrast to the deficit amount, neither Hatfield nor the debtor keeps track of the surplus, and this savings by Hatfield is not credited against later deficits.

A deficit or surplus, outside the range of the price window, may occur at any time, and Hatfield's hope is that any accumulated deficit will be negated by the times of surplus. While the hog partnership agreement provides that the debtor is required to pay off the deficit if it chooses to end the contract prematurely, absent breach or repudiation of the contract, only increases in market hog prices will cut the deficit. Although Hatfield states that at the time of negotiating this agreement it viewed the "ledger deficit as a financed obligation that it intended to collect,"[6] this is not sup-

---

agreement, which this court has examined extensively, the debtor is not liable to Hatfield for any pre-petition negative cash balance unless the debtor breaches, either by ceasing to supply market hogs or repudiating the contract." (Order of February 24, 2000 at 1.)

3. According to the testimony, when the market price drops below the contract range Hatfield and the debtor split the loss.

4. According to Hatfield's initial motion, filed on November 23, 1999, the post-petition deficit was accumulating "at the rate of approximately $50,000 per week." (Motion of Hatfield for order Directing Debtor to Reject Executory Contract at 3.) However, by the time of the hearing, prices had risen to the point that the deficit account was not increasing.

5. In addition, there is a "trigger price" within the window range whereby the price paid to the debtor is frozen and the difference between that price and the market price goes to pay off the deficit. The trigger price only goes into effect if a deficit exists.

6. Hatfield argues that this contract is, at the least, one for financial accommodations because "when market prices for [h]ogs drop beneath a pricing floor specified in the [c]ontract, Hatfield finances the [d]ebtor's operations and improves the [d]ebtor's cash flow by allowing the [d]ebtor to sell the hogs for an amount exceeding their market value." (Pretrial Statement of Law at 6–7.) Within the very same paragraph, though, Hatfield acknowledges that the only way it could recover the deficit amount is through "higher hog

ported by the plain language of the agreement. (Pre-trial Statement of Law at 6.)

Hatfield asserts two theories upon which this court should find that the hog partnership agreement is an executory contract that can neither be assigned nor assumed by the debtor. First, pursuant to § 365(c)(2) Hatfield argues that this agreement constitutes a contract to extend financial accommodations to the debtor, which cannot be assumed. Second, Hatfield posits that under § 365(c)(1) and alleged applicable nonbankruptcy law, § 2–210 of the Uniform Commercial Code ("UCC"), the debtor cannot assign the contract without the consent of Hatfield. Obviously Hatfield does not consent. Thus, as the debtor is barred from assigning or assuming the agreement, the court should enter an order directing the debtor to reject the agreement.

In conjunction with this forced rejection under either §§ 365(c)(1) or (2), Hatfield asserts that the automatic stay should be lifted "for cause" so that it may refuse hog shipments from the debtor. Last, it argues that the deficit accrued post-petition, at the rate of $50,000.00 per week, should be paid promptly to Hatfield upon the debtor's forced rejection as an administrative claim under §§ 503(b) and 507(a)(1), in addition to the creation of a general unsecured pre-petition claim for an amount in excess of five (5) million dollars.

*Analysis*

Hatfield's motion is brought under the authority of § 365(d)(2), which allows a party to an executory contract to request the court to order the debtor-in-possession to assume or reject it. This motion, though, only requests that the debtor-in-possession be forced to reject the hog partnership agreement, not that it alternatively be allowed to assume. During this hearing, testimony inevitably related to the intertwined analysis of whether the debtor-in-possession can assume was offered. Importantly, that is not the issue

presently before the court and it is not disposed of in this order; assumption is a live issue, raised by the proposed assumption of this agreement in the proposed plan. Nonetheless, there is no legal basis upon which to conclude that the debtor is barred under the Bankruptcy Code and nonbankruptcy law from assuming this agreement.

Section 365 generally gives a debtor-in-possession broad power to assume an executory contract, subject to the limitations of subsections (c)(1) and (c)(2). Those narrow limitations are inapplicable in this case. At the outset, and from a common sense point of view, the evidence offered by Hatfield is difficult to reconcile. On the one hand, Hatfield touts the debtor's ability to produce quality hogs and ship them in a flexible yet dependable manner, and also laments that no other such producers are contractually available. Further, Hatfield has renewed the hog partnership agreement with the debtor since filing this motion. Yet, based on the same facts, Hatfield asserts that the debtor must reject the contract as a matter of law.

Three bases exist for denying Hatfield's motion. First, the case law interpreting § 365(c)(2), specifically the term "financial accommodation," demonstrates that both in spirit and letter the hog partnership agreement does not fall within this category. Second, § 2–210 of the UCC is not a body of law that is typically applicable as nonbankruptcy law pursuant to § 365(c)(1). Last, even assuming that § 2–210 of the UCC is applicable nonbankruptcy law, there is insufficient evidence that the debtor-in-possession would be precluded from assigning the hog partnership agreement.

■ The hog partnership agreement is a supply contract with a price stabilization mechanism: a "window ledger," which according to testimony was a main issue during negotiations. On this basis, Hat-

prices," or "when the [d]ebtor terminates or    breaches the [c]ontract." (*Id.* at 7.)

field contends that price support is at the heart of this contract and therefore it is a financial accommodation. Nonetheless, the main purpose of this agreement is to supply hogs; it is not a "contract to make a loan, or extend other debt financing or financial accommodations," under the language of § 365(c)(2). Congress never intended for this provision to be as broad nor all inclusive as movant asserts. Were the movant's argument accepted, then nearly every supply of goods contract that did not require contemporaneous exchange could fall within the ambit of § 365(c)(2).

■ Courts have concluded that § 365(c)(2) should be strictly and narrowly construed to apply only to "contracts to make loans and other traditional kinds of debt financing arrangements." *In re Thomas B. Hamilton Co.*, 969 F.2d 1013, 1018–19 (11th Cir.1992). Otherwise, § 365(c)(2) "would turn every contract where the debtor owed money into a contract for financial accommodations and would 'allow the exception to swallow the rule.'" *In re The Travel Shoppe, Inc.*, 88 B.R. 466, 470 (Bankr.N.D.Ga.1988), *citing In re United Press International, Inc.*, 55 B.R. 63, 66 (Bankr.D.C.1985); *In re Farrell*, 79 B.R. 300, 304 (Bankr.S.D.Ohio 1987). Moreover, a contract under which "'the extension of credit is only incidental to or a part of a larger arrangement involving the debtor'" cannot be classified as a financial accommodation. *In re Best Products Co., Inc.*, 210 B.R. 714, 716 (Bankr.E.D.Va.1997), *citing In re Thomas B. Hamilton Co.*, 969 F.2d at 1019. Under the appropriate narrow interpretation the hog partnership agreement is clearly not a financial accommodation.[7]

As previously noted, this is not even an agreement under which the debtor owes any money; unless it breaches or repudiates, the debtor is simply required to preform. In fact, one of the Hatfield employees, involved in the contract negotiations, testified that Hatfield had "hoped" the deficit would be zero at the end of the agreement, not that it was a requirement of the contract. The intent of the parties was that market swings would allow Hatfield to recoup any deficit, and in fact, from May of 1996 to December 1997 the deficit ledger was zero. It should also be noted that any surpluses, split between the debtor and Hatfield, have not been recorded, so it is somewhat misleading to view the benefit of this bargain only in terms of the deficit ledger amount. Last, the deficit ledger amount is not reflected in Hatfield's accounting records as an asset and Hatfield's counsel admitted that this is not a "fixed enough item" to appear as a line item on an asset statement.

■ The legislative history to this section also supports this court's conclusion. "Characterization of contracts to make a ... financial accommodation, is limited to the extension of cash or a line of credit and is not intended to embrace ordinary ... contracts to provide goods or services...." 124 Cong.Rec. H11089 (daily ed. September 28, 1978) (statement of Rep. Edwards), reprinted in 1978 U.S.C.C.A.N. 5787, 6436, 6447 (1978). *Collier on Bankruptcy* states the same principle, though the treatise also notes, as does the case law, that a financial accommodation does not include "incidental financial accommodations or extensions of credit." 3 *Collier on Bankruptcy* ¶ 365.06[2] (Lawrence P. King ed., 15th ed.1999.) Last, the purpose of this provision "is to protect a party who has made an unperformed lending commitment." *In re The Travel*

---

7. For contrasting cases that do involve a financial accommodation see *In re Sun Runner Marine, Inc.*, 945 F.2d 1089 (9th Cir.1991) (involving a floor agreement between a bank and retail boat dealers, under which loans were made to accommodate the debtor); *In re Placid Oil Co.*, 72 B.R. 135 (Bankr.N.D.Tex. 1987) (finding a retrospective insurance premium arrangement to be an extension of credit for the benefit of the debtor); *In re Taylor Freezers of Alabama, Inc.*, 115 B.R. 333 (Bankr.N.D.Ala.1990); *In re Postle Enterprises, Inc.*, 48 B.R. 721 (Bankr.D.Ariz.1985) (concluding that a lease under which the debtor could demand a $150,000 cash transfer was a financial accommodation).

*Shoppe, Inc.,* 88 B.R. at 470. The plain language and legislative history both instruct that section 365(c)(2) does not include a hypothetical deficit ledger amount that is the by-product of an agreement between two parties to hedge on the hog market.

The *Hamilton* case, involving a private label revolving credit plan agreement, supports the conclusion that the hog partnership agreement is not a financial accommodation.[8] In *Hamilton,* the nondebtor company purchased all of the debtor merchant's sales drafts from customers' credit cards, and would end up, in effect, extending credit to the merchant on transactions where a customer would later dispute a credit card charge and obtain a charge back. Arriving at the conclusion that this agreement was not for financial accommodation, that court looked at the "true legal nature" of the agreement and concluded that it was to facilitate the use of credit cards, not to make financial accommodations. *In re Thomas B. Hamilton Co.,* 969 F.2d at 1020. In the case at bar, the true legal nature of the agreement was to supply hogs.

In Hatfield's second line of argument, that the contract cannot be assumed under § 365(c)(1) and § 2–210 of the UCC, it argues that the court must employ the so-called hypothetical assignee test. As applied in this case, the court must determine whether or not the debtor-in-possession could assign its rights and duties under the contract to another hog producer, even though it has no intention to do so. Hatfield states that the debtor-in-possession cannot assign because that "would materially increase the burdens on Hatfield in a number of ways," in violation of UCC § 2–210. (Pre-trial Statement of Law, 3/14/00.) Therefore, the debtor-in-possession, viewed as a separate entity from the debtor, cannot assume the hog partnership agreement because it could not assign the agreement to a third party under UCC § 2–210.

■ As *Collier on Bankruptcy* notes, "365(c) was intended to relieve the non-debtor party ... from having to deal with a party other than the debtor in situations in which, under nonbankruptcy law, the nondebtor party would be relieved of any obligation to continue such dealings." 3 *Collier on Bankruptcy* ¶ 365.06[1][d][i] (Lawrence P. King ed., 15th ed.1999.) Section 365(c)(1)(A) specifically prohibits a debtor-in-possession [9] from assuming or assigning an executory contract if "applicable law excuses a party, other than the debtor ... from accepting performance from ... an entity other than the debtor or the debtor in possession ...," and "such party does not consent to such assumption or assignment." 11 U.S.C. § 365(c)(1)(A) and (B).

■ The key phrase in this provision is "applicable law." In the context of § 365(c)(1), the term "applicable law" refers to "nonbankruptcy law that excuses the nondebtor from accepting performance from or rendering performance to anyone other than the debtor." *In re Schick,* 235 B.R. 318, 323 (Bankr.S.D.N.Y.1999), *citing, e.g., In re Catapult Entertainment, Inc.,* 165 F.3d 747, 752 (9th Cir.1999), *petition for cert. filed* 528 U.S. 924, 120 S.Ct. 369, 145 L.Ed.2d 248, 67 U.S.L.W. 3749 (1999); *City of Jamestown, Tenn. v. James Cable Partners, L.P. (In re James Cable Partners, L.P.),* 27 F.3d 534, 538 (11th Cir. 1994); *Rieser v. Dayton Country Club Co. (In re Magness),* 972 F.2d 689, 695–96 (6th Cir.1992). Common situations where applicable law prohibits a party from assigning and therefore assuming in bankruptcy typically arise within personal services contracts, patent law, government contracts and other such transactions where

---

8. The case *In re Best Products Co.,* decided by the United States Bankruptcy Court, Eastern District of Virginia, is substantially the same case. 210 B.R. 714.

9. Section 1107(a) of the bankruptcy code gives the debtor-in-possession the same rights as a trustee under § 365. 11 U.S.C. § 1107(a).

the applicable law contains a per se prohibition on delegation or assignation.[10]

The judicial stance on applying § 365(c)(1) is mixed at best. A majority of the circuit courts have endorsed the "hypothetical test," while a majority of the lower courts have utilized the "actual test." *See United States v. TechDyn Systems Corp. (In re TechDyn Systems Corp.)*, 235 B.R. 857, 860–61 (Bankr.E.D.Va.1999). More importantly, the Fourth Circuit Court of Appeals has not yet taken a clear position on this issue.[11] There is some guidance, though, found in other Fourth Circuit bankruptcy court decisions and a case out of the Court of Appeals for the Ninth Circuit, which have chosen the hypothetical test over the actual test. *See In re TechDyn Systems Corp.*, 235 B.R. 857, *citing In re Catron*, 158 B.R. 629; *In re Antonelli*, 148 B.R. 443, 448 (D.Md.1992); *Perlman v. Catapult Entertainment, Inc.*

*(In re Catapult Entertainment, Inc.)*, 165 F.3d 747, 750 (9th Cir.1999).[12]

For the purposes of this order, the court will apply the hypothetical test in analyzing Hatfield's contentions as to § 365(c)(1), though the actual test would produce the same result.[13] As stated in the most recent court of appeals case to address this issue:

> The literal language of § 365(c)(1) is ... said to establish a 'hypothetical test': a debtor in possession may not assume an executory contract over the nondebtor's objection if applicable law would bar assignment to a hypothetical party, even where the debtor in possession has no intention of assigning the contract in question to any such party.

*(In re Catapult Entertainment, Inc.)*, 165 F.3d at 750. Application of the hypothetical test directs this court to determine whether a body of nonbankruptcy or "applicable" law contains a prohibition on as-

**10.** In one such case, dealing with a governmental contract, the court barred the debtor-in-possession from assuming the contract because the applicable law, the Anti–Assignment act, prohibited assignment of the debtor's government contracts, even though the debtor did not intend to assign the contracts. *See United States v. TechDyn Systems Corp. (In re TechDyn)*, 235 B.R. 857 (Bankr.E.D.Va.1999); *see also In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir.1983) (federal law governing the Federal Aviation Administration restricted assignment of unexpired leases). An example of a bar on assumption due to the non-assignable status of an agreement under patent law is *In re Catapult Entertainment, Inc. See* 165 F.3d 747 (9th Cir.1999).

**11.** Although the Fourth Circuit Court of Appeals has affirmed a decision by the Bankruptcy Court, Eastern District of Virginia, which accepted the hypothetical test, Local Rule 36(c) states that "[c]itation of this Court's unpublished dispositions ... is disfavored ...." 4th Cir. R. 36(c); *In re Catron*, 158 B.R. 629, 633 (E.D.Va.1993), *aff'd* 25 F.3d 1038 (4th Cir.1994) (unpublished op.). The Fourth Circuit Court of Appeals also addressed this issue in another unpublished disposition, the year prior, in the case *Gould v. Antonelli (In re Antonelli)*, 4 F.3d 984, 1993 WL 321584 (4th Cir.1993).

**12.** This opinion recognized that the hypothetical test, which in this case involved applica-

tion of the Anti–Assignment Act, 41 U.S.C. § 15, equates to a "blanket refusal to permit a reorganized debtor to assume valuable Government contracts over the Government's objection," and therefore the hypothetical test "may well represent poor bankruptcy policy." *In re TechDyn*, 235 B.R. 857, 864. Even so, the court went on to endorse the hypothetical test, relying upon the unambiguous, plain language of § 365(c)(1) and opining that "bad policy does not justify a judicial rewrite of the Bankruptcy Code." *Id.*

**13.** There is case law, and commentary from the venerable Collier on Bankruptcy, which suggests that utilizing the hypothetical test to bar assumption when the debtor and debtor-in-possession are the same entity is misplaced and works against the goal of reorganization. *See* 3 Collier on Bankruptcy ¶ 365.06[1][d][ii] (Lawrence P. King ed., 15th ed.1999.) The alternative analysis is the actual test, treating the debtor and debtor-in-possession as the same entity and considering whether it will actually assign the contract. For cases that disagree with the hypothetical test and apply the actual test see *Summit Inv. and Dev. Corp. v. Leroux*, 69 F.3d 608 (1st Cir.1995); *In re GP Express Airlines, Inc.*, 200 B.R. 222 (Bankr.D.Neb.1996); *In re American Ship Bldg. Co.*, 164 B.R. 358 (Bankr.M.D.Fla. 1994).

signment. The hypothetical test, as stated and to be analytically consistent, must assume the existence of a hypothetical assignee who is able to perform the contract. Thus, the only question is whether the debtor can assign to such a hypothetical entity, or whether applicable law contains a blanket prohibition. The inquiry does not turn on a factual analysis of whether an actual assignee is available and able to perform as Hatfield suggests in asserting that UCC § 2–210 bars assignment.

█ Section 2–210 of the UCC does not contain an absolute prohibition on assignment of contracts by substantive content, as does the common law on personal services contracts, statutory provisions governing patents, and the Anti–Assignment Act found at 41 U.S.C. § 15 applicable to government contracts. Section 2–210 of the UCC is an exception to the general UCC rule that contracts for the sale of goods are freely assignable.[14] This is the critical distinction. To argue that this UCC provision is applicable under § 365(c)(1), one must insert an actual assignee analysis into the hypothetical test and the court would have to explicitly look at the potential assignee. This would require the court to delve into a comprehensive factual analysis of whether "assignment would materially change the duty of the other party, increase materially the burden or risk imposed on him by his contract, or impair materially his chance of obtaining return performance." 13 Pa. Cons.Stat. Ann. § 2210 (West 1999). Hence, UCC § 2–210 is not a per se substantive prohibition and is not a body of law that falls under the "applicable law" category within the narrow provision of § 365(c)(1).

█ Even assuming that UCC § 2–210 is applicable law, the evidence presented by Hatfield is not persuasive that the debt-

or is barred from assigning the agreement. Hatfield obtains approximately fifty-five percent of its hogs on the open market and only ten percent under its contract with the debtor. Moreover, Hatfield employees testified that Hatfield does not recommend specific genetic or feed programs for contract producers, recognizing that there is not much variation today among the leanness, color and size of prime cuts found in hogs from different producers. In essence, the quality of hogs has become fairly homogenous due to packagers' desires for a uniform product; one witness described today's market supply as comprised of "cookie-cutter" hogs. Further, this agreement did not require James Neuhoff or his father to be in control of the producer company, and in no way was the agreement made with either of those people personally. Service could be rendered by the debtor, regardless of who was in charge, and hogs from almost any other producer would suffice.

The only evidence offered to support this assertion was testimony that there may not be another east coast producer who could contract to supply this many hogs a year. Hence, Hatfield would have to obtain this number of hogs from multiple producers, creating more scheduling work. No quantitative analysis was provided to support this assertion, though, and at the same time Hatfield would not have to pay the contract prices per pound to the debtor, instead bargaining on the open market. Further, despite Hatfield's attempt to force the debtor to reject the agreement and cease supplying hogs, Hatfield has not identified a replacement supplier but does not intend to reduce its intake volume. Essentially, Hatfield is confident it can replace the debtor's supply from other sources without significant disruption.

14. As admitted by Hatfield, the hog partnership agreement is a contract for the sale of goods to which Article 2 of the UCC applies.

For the aforementioned reasons, Hatfield's motion is hereby denied.

**So Ordered.**