**In re UAL CORPORATION,
et al., Debtors.**

**No. 02 B 48191.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

April 17, 2003.

James H.M. Sprayregen, David Seligman, Steven R. Kotarba, Kirkland & Ellis, Chicago, IL, for Debtors.

John M. Newman, Jr., Heather Lennox, Jones, Day, Cleveland, OH, Ilana Glazier, Daniel B. Prieto, Jones, Day, Chicago, IL, for National Processing Company, LLC and National City Bank of Kentucky.

Fruman Jacobson, Carole Neville, Sonnenschein, Nath & Rosenthal, Chicago, IL, for Official Committee of Unsecured Creditors.

## AMENDED MEMORANDUM OF DECISION

EUGENE R. WEDOFF, Chief Judge.

These administratively consolidated Chapter 11 cases have come before the court on a motion by parties that process a major part of the credit card sales of one of the debtors. The motion seeks a determination that the agreement governing the credit card processing is either (1) a financial accommodation that cannot be assumed under § 365(c)(2) of the Bankruptcy Code (Title 11, U.S.C.) or else (2) an assumable executory contract that should be assumed or rejected immediately, with assumption conditioned on the debtor providing adequate assurance of its future performance pursuant to § 362(b)(1). For the reasons discussed below, the agreement is not a financial accommodation, and since the debtor has not defaulted under the agreement, no adequate assurance of future performance is required. Accordingly, the pending motion is granted only to the extent of requiring the debtor to effectuate its decision to assume the agreement immediately.

### Jurisdiction

Federal district courts have exclusive jurisdiction over bankruptcy cases. 28 U.S.C. § 1334(a). Pursuant to 28 U.S.C. § 157(a), district courts may refer bankruptcy cases to the bankruptcy judges for their district, and, by Internal Operating Procedure 15(a), the District Court for the Northern District of Illinois has made such a reference of the pending cases. When presiding over a referred case, a bankruptcy judge has jurisdiction, under 28 U.S.C. § 157(b)(1), to enter appropriate orders and judgments in core proceedings within the case. Motions concerning the assumption or rejection of executory contracts are core proceedings under 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate), and (b)(2)(O) (proceedings adjusting the debtor-creditor relationship). *In re Dunes Hotel Associates,* 194 B.R. 967, 992–93 (Bankr.D.S.C. 1995); *see Moody v. Amoco Oil Co.,* 734 F.2d 1200, 1208 (7th Cir.1984) (holding that a determination of the executory nature of a contract was within the jurisdiction of the bankruptcy court under the temporary jurisdictional system that was the model for the present law). This court therefore has jurisdiction to enter a final ruling on the pending motion.

## Findings of Fact

The facts relevant to the pending motion are largely undisputed. In the course of operating a major airline, United Airlines, Inc. ("United"), one of the debtors whose cases are now before the court, allows its customers to purchase tickets for air travel using credit cards. United accepts several different credit card brands, including MasterCard and VISA, and credit card sales constitute a major part of its income—some $19 billion in 2001. As of November 11, 2000, the movants, National Processing Company, LLC ("NPC") and National City Bank of Kentucky ("NC Bank") (collectively "National"), entered into a "Charge Card Processing Agreement" with United to process MasterCard and VISA purchases made by United's customers. In its basic outline, the United/National agreement is no different from processing agreements applicable to all vendors providing goods or services to credit card customers; it contains the following essential provisions:

● United is required to honor valid charge cards of all types covered by the agreement, principally MasterCard and VISA, presented by customers wishing to make purchases or obtain refunds. (Agreement, §§ 4.1, 4.6(a).)

● United is required to transmit records of credit card sales and refunds covered by the agreement for processing by NPC. (§§ 4.3, 4.6(a), 5.1, 5.2(b).)

● NPC is required to process the credit card transaction records, with NC Bank placing the records with the appropriate credit card network for collection from (or credit to) the card issuing bank, a process referred to as "settlement". (§ 5.2(a).)

● United is required to maintain a "merchant account" with NC Bank. After completion of the settlement process through the credit card network, NC Bank is required to credit United's merchant account with the face value of the processed transactions, less agreed upon processing fees and less "chargebacks". (§ 5.4(a) and (b).) (The extent of the processing fees differs from one merchant to another, and the fees charged to United under the National agreement are substantially greater than those charged to merchants whose goods or services are less likely to result in refunds or chargebacks.)

● A "chargeback" is defined as a transaction for which payment is denied for cause, after settlement, by the financial institution that issued the card used in the transaction. (§ 1.12.) (In the situation of United, a potential cause for a chargeback would be a flight cancellation that results in the inability of a credit card customer to use a purchased ticket and a consequent refusal by the customer to pay the charge attributable to the ticket.)

● In the event of a "material adverse effect," defined as a rating of United's senior unsecured bonds below specified levels, United is obligated to fund a reserve account to cover its potential liability to National for refund credits, chargebacks, and fees. (§§ 1.33, 9.1.)

● National is required to comply with the rules of the MasterCard and VISA networks. (§§ 1.49, 8.2(a).) (Under these rules, NC Bank is liable to the issuing bank for refunds and chargebacks, regardless of whether NC Bank is able to collect the refunds and chargebacks from United.)

United and the other debtors filed the pending bankruptcy cases on December 9, 2002. Prior to that time, United had been required to establish a reserve account in connection with the National agreement due to the existence of a material adverse effect as defined in the agreement. However, United was not in default under any of the terms of the agreement prior to the bankruptcy filing.

Among the motions presented by the debtors on the day of their bankruptcy filing was a motion to assume five separate credit card processing agreements, including the National agreement. The motion asserted that, in the business judgment of the debtors, it was in United's best interest to assume the agreements, since the airline intended to remain in business, and since, "[a]s the largest source of United's revenues, credit card sales are an absolutely essential component of United's business." (Motion, ¶ 59.) The court entered an order provisionally granting the motion, subject to objection by the other parties to the agreements. Thereafter, National objected to the motion, and, in response, the debtors withdrew the motion as to National, stating a willingness to operate under the National agreement pending a later assumption or rejection.

National filed the present motion on February 28, 2003. The motion requests alternative determinations: either (1) that the United/National agreement is a financial accommodation, which cannot be assumed, or (2) that, if the agreement is subject to assumption, United should be required to assume or reject immediately, with assumption conditioned on the provision of adequate assurance that it will be able to perform in the future.

The parties briefed the motion, and the court held a hearing on the matter, limited to the question of the nature of the agreement and whether United defaulted under the agreement after the bankruptcy filing. National introduced no evidence of any such default, and the court noted that the only breaches of the contract asserted by National (a delay of a few hours in processing prepetition credits and chargebacks and a delay in providing required reports) would not have been material. Also at the hearing, United agreed to assume the National credit card processing agreement immediately as long as assumption would not require adequate assurance of future performance.

### Conclusions of Law

■ Section 365 of the Bankruptcy Code allows a debtor in possession, under defined circumstances, to assume executory contracts. An executory contract is one in which the debtor must satisfy significant obligations in order to obtain significant performance from the other party to the contract. Assumption simply means that the debtor, on behalf of the bankruptcy estate, fully accepts both the benefits and burdens of the contract at issue. The alternative to assumption—rejection of the contract—has the effect of denying to the estate the benefit of the other party's performance, but also allows the debtor to treat any prepetition default as a claim with ordinary priority, rather than as an obligation that must be satisfied in full from the assets of the estate. *See In re Resource Technology Corp.*, 254 B.R. 215, 220–23 (Bankr.N.D.Ill.2000) (generally discussing the operation of § 365).

In the present case, the parties acknowledge that the United/National credit card processing agreement is an executory contract—all of the parties to the contract have substantial obligations remaining to be performed—and United has indicated its desire to assume the contract. National's pending motion raises two obstacles to assumption.

■ 1. *Financial accommodation/assumability.* Section 365(c)(2) denies the right to assume an executory contract where "such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor." National's principal argument is that its credit card processing agreement with United is a financial accommodation and so cannot be assumed. This situation would result in

the contract being automatically rejected, with UAL required to negotiate new terms—presumably more burdensome to the bankruptcy estate—either with National or another credit card processor. *See In re Ardent, Inc.*, 275 B.R. 122, 127 (Bankr.D.D.C.2001) (contract incapable of assumption under § 362(c)(2) must be rejected); *Transamerica Commercial Finance Corp. v. Citibank, N.A. (In re Sun Runner Marine Inc.)*, 945 F.2d 1089, 1092–94 (9th Cir.1991) (financial accommodation contract could not be assumed by debtor even with lender's consent, and any substitute contract would require separate notice and hearing under § 364 of the Code).

■ The term "financial accommodation" is not defined in the Bankruptcy Code, but given its context, the term must mean something akin to an agreement to make a loan, since "financial accommodation" is put in the same class as contracts to make loans and extensions of debt financing. Thus, on its face, § 365(c)(2) appears to apply to agreements that have extensions of credit as their primary purpose. The legislative history confirms this. In introducing the compromise bill that was enacted as the Bankruptcy Code, the joint statement of the floor managers explained § 362(c)(2) as follows: "Characterization of contracts to make a loan, or extend other debt financing or financial accommodations is limited to the extension of cash or a line of credit and is not intended to embrace ordinary leases or contracts to provide goods or services with payments to be made over time." 124 Cong. Rec. H11089 (daily ed. September 28, 1978) (statement of Rep. Edwards), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6436, 6447 (1978); 124 Cong. Rec. S17406 (daily

ed. October 6, 1978) (statement of Sen. DeConcini), *reprinted in* 1978 U.S.C.C.A.N. 6505, 6515.[1]

Not surprisingly, then, nearly all of the judicial opinions and commentaries dealing with the questions have required a narrow construction of § 362(c)(2), with many decisions quoting the following observation from *Collier on Bankruptcy:*

> The scope of [§ 365(c)(2)] is limited … and applies only to extensions of credit which are "loans," "debt financing," or "financial accommodations," and not to all contracts to extend credit. These terms are strictly construed and do not extend to an ordinary contract to provide goods or services that has incidental financial accommodations or extensions of credit.

3 Collier on Bankruptcy ¶ 365.06[2], at 365–64 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.2002) (footnote omitted); *see Citizens & So. Nat'l Bank v. Thomas B. Hamilton Co. (In re Thomas B. Hamilton Co.)*, 969 F.2d 1013, 1018 (11th Cir.1992); *Gill v. Easebe Enterprises, Inc. (In re Easebe Enterprises, Inc.)*, 900 F.2d 1417, 1419 (9th Cir.1990); *In re Emerald Forest Constr., Inc.*, 226 B.R. 659, 664 (Bankr.D.Mont.1998); *Huntington Nat'l Bank v. Alix (In re Cardinal Indus.)*, 146 B.R. 720, 731 (Bankr.S.D.Ohio 1992).

In accord with this rule of construction, courts have declined to apply § 365(c)(2) to agreements involving extensions of credit where credit extension was not the primary purpose of the agreement. *See, e.g., In re Neuhoff Farms, Inc.*, 258 B.R. 343 (Bankr.E.D.N.C.2000) (supply contract with initial above-market payments to the debtor not a financial accommodation); *In*

---

**1.** A full review of the legislative history of § 365(c)(2) is set out in *In re Teligent, Inc.*, 268 B.R. 723, 734–37 (Bankr.S.D.N.Y.2001).

re United Press International, Inc., 55 B.R. 63 (Bankr.D.C.1985) (lease requiring substantial initial expenditure by landlord prior to rent payments by debt not a financial accommodation); In re The Travel Shoppe, Inc., 88 B.R. 466 (Bankr.N.D.Ga. 1988) (agreement between airline ticket clearinghouse and debtor travel agency, requiring clearing-house to make payment to airlines for tickets sold by debtor prior to receipt of proceeds from debtor, not a financial accommodation); In re Charrington Worldwide Enterprise, Inc., 110 B.R. 973 (M.D.Fla.1990), remanded on other grounds, 922 F.2d 847 (11th Cir.1990) (unpublished opinion) (same); In re Karsh Travel, Inc., 87 B.R. 110 (Bankr.N.D.Cal. 1988), aff'd, 102 B.R. 778 (N.D.Cal.1989), appeal dismissed as moot, judgment vacated in part, 942 F.2d 792 (9th Cir.1991) (same).[2]

Most significantly, in each of the several reported decisions considering the question, credit card processing agreements (sometimes referred to as "merchant agreements") have been held assumable under § 365. See Citizens & So. Nat'l Bank v. Thomas B. Hamilton Co. (In re Thomas B. Hamilton Co.), 969 F.2d 1013, 1018–20 (11th Cir.1992); In re National Hydro–Vac Indus. Services, L.L.C., 262 B.R. 781, 784 (Bankr.E.D.Ark.2001); In re Best Products Co., 210 B.R. 714, 717–18 (Bankr.E.D.Va.1997); In re Health Science Products, Inc., 181 B.R. 121, 124 n. 2 (Bankr.N.D.Ala.1994).

The Eleventh Circuit's 1992 decision in Hamilton is the leading case, and no published opinions disagree with its analysis of the question: (1) the purpose of a credit card processing agreement is "to establish a relationship that will permit [the debtor] to accept the use by customers of credit cards instead of cash in the course of its business"; (2) "the specific terms of the Agreement do not evidence any intent on the part of [the processing bank] to extend credit to [the debtor]"; (3) the fact that the debtor is liable to the processing bank for chargebacks "can only be viewed as incidental to the overall relationship"; and (4) "[t]he Agreement is not, therefore, a contract to extend financial accommodations within the meaning of § 365(c)(2)." 969 F.2d at 1020.

The court in Hamilton also noted that applying the established interpretation of § 365(c)(2) to the credit card processing agreement involved in that case was consistent with the general bankruptcy policy of promoting reorganization: "The Agreement at issue here is typical of credit card merchant agreements between all kinds of merchants and merchant banks. If these agreements may not be assumed by the trustee following a bankruptcy filing, rehabilitation will be virtually impossible for any merchant who relies heavily on credit card sales." Id.

The analysis used by the Eleventh Circuit in Hamilton is fully applicable to the present case. The principal purpose of the United/National agreement is to allow United to accept MasterCard and VISA charges from its customers in payment of airline tickets. And although National repeatedly argued that the agreement requires it to "advance" funds to United, National acknowledged at the hearing that the agreement only requires it to transmit to United the net funds that National it-

2. In contrast, where the principal purpose of an agreement was to extend credit, courts have held the agreement to be a financial accommodation under § 365(c)(2). See, e.g., In re Sun Runner Marine Inc., 945 F.2d 1089, 1092 (9th Cir.1991) (agreement to provide financing to debtor's retail dealers); In re Whiteprize, LLC, 275 B.R. 868 (Bankr.D.Ariz. 2002) (land sale contract with seller financing); In re Cardinal Indus., 146 B.R. 720 (Bankr.S.D.Ohio 1992) (credit agreement providing a revolving line of credit to debtor).

self receives from the credit card networks through the settlement process. There is no requirement under the agreement that National advance funds to United. The only extension of credit required of National by the agreement is of the same type presented by the processing agreement in *Hamilton*, a "backup" or "guarantor" position as to credits and chargebacks: to the extent that United had inadequate valid credit card receipts to offset credits and chargebacks, NC Bank would be required to pay these items. However, as in *Hamilton*, this guarantor function is not addressed in the terms of the agreement itself; rather, it is a function of the rules of the MasterCard and VISA credit card systems. Thus, as with the processing agreement in *Hamilton*, the credit extension involved in the United/National agreement is incidental to the principal purpose of the agreement, and the agreement is not a financial accommodation within the meaning of § 365(c)(2). And, of course, requiring termination of the United's credit card processing agreement at the outset of the case would significantly impair the prospects for a successful reorganization.

National's only argument against application of the *Hamilton* analysis is that the risk of chargebacks and credits from United's operations is so great that National's role as guarantor must be seen as central to the processing agreement. The difficulty with this argument is two-fold. First, whatever the degree of credit risk, the principal purpose of the agreement is still manifestly to allow United to make credit card sales of its tickets, and the principal purpose governs the application of § 365(c)(2). Second, there is no principled

basis for applying the rule of interpretation that National advocates. Since nearly all retailers in the present day economy sell their goods and services through credit cards, there is an extraordinary range of potential risk levels for a processing bank. At one end, a merchant selling groceries is likely to experience very low incidents of credits and chargebacks, and any credits that do occur (from returned groceries) are likely to take place shortly after the sale in question. Airline charges may be at the other end of the spectrum, since flights are regularly cancelled and tickets may be purchased months before the scheduled flight. Yet there are many other types of credit card commerce that present risks of return—mail order sales of products with lengthy money-back guarantees, for example. It is simply not possible to distinguish one credit card processing agreement from another based on the degree of credit risk presented.

In contrast, the rule of decision looking to the principal purpose of the agreement allows for predictable decision-making under § 365(c)(2). Under this rule, parties to credit card processing agreements can anticipate that the agreements are subject to assumption in bankruptcy and negotiate the terms of the agreement accordingly—as National and United appear to have done in setting relatively high processing charges and in requiring United to establish a reserve account in the event of a deterioration in its bond ratings—rather than negotiate terms with an uncertain potential for the agreement being subject to cancellation if a bankruptcy judge later finds that the risk of chargebacks in a particular merchandizing situation is too great.[3]

---

**3.** National makes a further risk-based argument, citing the following dicta in *Hamilton:*
[Section] 365(a) provides that the trustee, subject to the bankruptcy court's approval,

may assume an executory contract. Obviously, the bankruptcy court should not approve the assumption of a credit card merchant agreement if the merchant bank

**2.** *Adequate assurance of future performance.* National's remaining argument is that, if its credit card processing agreement with United is subject to assumption under § 365, then United must provide "adequate assurance" that it will be able to perform its future obligations under the agreement—specifically, that it will be able to cover any credits or chargebacks that might come about in the event that it ceases operations. This argument fails, however, because the requirement of adequate assurance is applicable only in the event that the debtor is in default under the contract it is seeking to assume. The pertinent provision is § 365(b)(1):

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee [or, as here, the debtor in possession exercising the powers of the trustee] may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee [or debtor in possession]—
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

All of the requirements for assumption imposed here are applicable "if there has been a default," and, again, the published decisions and commentary have applied § 365(b)(1) consistent with this limitation. *Collier* points out the plain impact of the subsection's language:

> By its terms, section 365(b) applies only when there has been a default. If there has been no default, the trustee or debtor need not comply with the cure, compensation, and adequate assurance requirements of section 365(b). Instead, the trustee, subject to court approval, may simply assume a contract or lease, unless such assumption is barred by other provisions of section 365 . . . .

3 Collier on Bankruptcy ¶ 365.05[1], at 365–47 to 365–48 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.2002). The decisions in accord include *In re Goldblatt Bros., Inc.,* 766 F.2d 1136, 1140 (7th Cir.1985) (holding § 365(b)(1) inapplicable to a lease not in default). *See also In re National Shoes, Inc.,* 20 B.R. 51 (Bankr.S.D.N.Y.1982)(applying § 365(b)(1) in the context of a lease, with the observation that "[t]he debtor's enterprise . . . will not be disrupted and its Chapter 11 impaired because the landlord would like another tenant or more from the debtor than the lease provides"); *In re Bon Ton Restaurant and Pastry Shop, Inc.,* 53 B.R. 789, 804 (Bankr.N.D.Ill.1985) (observing, in the application of § 362(b)(1), that "[i]t is not intended that a non-debtor party should acquire greater rights in a case under the Code than he has outside the Code").

The provisions of § 362(b)(1) do not, in fact, provide non-debtor parties to executory contracts with greater rights than they

---

demonstrates that continued performance of the agreement would place it at unreasonable risk, such as when the merchant's sales result in an unusually high percentage of chargebacks . . . .

969 F.2d at 1021. However, this suggestion suffers from the same difficulty as National's

argument on financial accommodation: there is no principled basis for a court or the parties to an executory contract to determine how much incidental credit risk in an executory contract is "unreasonable."

would have under applicable nonbankruptcy law. Rather, the provisions for cure of default and adequate assurance of future performance are a substitute for the right that the non-debtor would otherwise have to terminate the contract. If nonbankruptcy law would require the non-debtor to continue performing under the contract, the mere fact of a bankruptcy filing cannot eliminate that performance obligation. *See* 11 U.S.C. § 365(e)(1) (rendering ineffective "ipso facto" provisions purporting to terminate contracts in the event of a party's insolvency or bankruptcy).

In the present case, National has shown no breach of the credit card processing agreement by United that would, under applicable nonbankruptcy law, constitute a material default by United, excusing National's performance under the agreement. Accordingly, while National will continue to hold the reserve account that the contract established to assure United's performance, United is not required by § 362(b)(1) to provide additional assurances of future performance not required by the contract itself.

## Conclusion

For the reasons set forth above, insofar as National's motion requests a determination that its credit card processing agreement with United is a financial accommodation or that United, in order to assume the contract, is required to provide adequate assurance of future performance under § 362(b)(1) of the Bankruptcy Code, the motion is denied. Insofar as the motion seeks immediate assumption or rejection of the agreement, it is granted, and, pursuant to the consent of United, the agreement is assumed. A separate order will be entered consistent with these determinations.