# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-4339

In the matter of:

UNITED AIRLINES, INCORPORATED,

*Debtor.*

Appeal of:

NATIONAL PROCESSING COMPANY, LLC,
and NATIONAL CITY BANK OF KENTUCKY,

*Appellants.*

———————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 03 C 3909—**Samuel Der-Yeghiayan**, *Judge.*

———————

ARGUED APRIL 9, 2004—DECIDED MAY 11, 2004

———————

Before BAUER, EASTERBROOK, and KANNE, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Debtors in bankruptcy may enforce most executory contracts that predate their petitions. The Bankruptcy Code has some exceptions, however. Section 365(c)(2) (11 U.S.C. §365(c)(2)) is one: a debtor may not assume "a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor". National Processing contends that a credit card merchant agreement

is a "financial accommodation" that cannot be assumed in bankruptcy. Bankruptcy Judge Wedoff rejected this position. 293 B.R. 183 (Bankr. N.D. Ill. 2003). The district judge affirmed. 2003 U.S. Dist. LEXIS 22387 (N.D. Ill. Dec. 11, 2003). These decisions follow the only appellate opinion on the subject. *In re Thomas B. Hamilton Co.*, 969 F.2d 1013 (11th Cir. 1992). Like the eleventh circuit, we hold that a trustee in bankruptcy, or a debtor in possession, may assume a credit-card-processing agreement.

The debtor is United Airlines, the nation's second-largest air carrier, which has been in a Chapter 11 reorganization since December 2002. Two years earlier, National Processing had signed a five-year contract to handle the transactions of United's customers who pay with VISA or MasterCard credit cards. United verifies each transaction using automated systems maintained by the VISA and MasterCard networks. For each completed transaction it transmits a paper or digital sales record to National Processing, which enters the information into the VISA or MasterCard settlement network. The network dispatches each transaction to the customer's bank, which advances funds from the customer's line of credit and remits to the network. Each network makes a daily wire transfer to National Processing of any balance (net of fees and charge-backs) due to United. And National Processing makes the balance available in United's account at its affiliate National City Bank of Kentucky.

Issuing banks (that is, the banks that issued the credit cards to United's passengers), the interbank networks, and the merchant bank (National Processing and National City Bank, which transact with United and other merchants) all collect fees for their services; these are deducted from the balance remitted to the merchant. Chargebacks are reversals of transactions. If the passenger has a refundable ticket and does not fly, United will credit the passenger's card; similarly, if United cancels the flight and the passenger

does not rebook, a chargeback will occur. If United were to ground its fleet or substantially curtail its service, chargebacks would exceed new sales, and the daily balances in the system would go negative. United would owe the difference to National Processing, which would distribute proceeds to the issuing banks and their customers. If United could not pay, however, then the merchant bank, the issuing bank, or the customer would bear the loss. National Processing contends that the rules of the VISA and MasterCard national associations allocate that loss to the merchant bank. This means, National Processing contends, that it has guaranteed United's (contingent) debts to the passengers, and because a guaranty is a "financial accommodation" National Processing insists that the credit-card-processing agreement cannot be assumed. United would take new bids for this service, and the price of financial intermediation (that is, the fees deducted from the charge for each ticket) likely would rise because the risk of United's default is higher now than it was in December 2000.

National Processing's lead argument is that the credit-card system operates like a revolving line of credit. Airlines sell tickets in advance of their flights; the cash flow received through the credit-card network is a form of net borrowing until they provide the transportation for which customers prepay. A line of credit directly with National City Bank of Kentucky could not be assumed in bankruptcy. United would need to renegotiate and pay higher interest rates or give better security. Why not the same legal result for the same flow of funds in advance of flights, National Processing inquires. The answer is that neither National Processing nor National City Bank lends United (or any other merchant) one penny. Any loan is made by the issuing bank, not the merchant bank; the loan is to the issuing bank's customer (United's passenger), not to United. National Processing does not deposit anything into United's

account at National City Bank until after the issuing bank has made the loan to its customer and placed the funds in the interbank system on the customer's behalf. By acting as an intermediary, National Processing no more makes a "financial accommodation" to United than does any other participant in this process—the Internet service provider through which data flows, the courier that moves paper records, the Federal Reserve wire-transfer apparatus, and the other contributors to a financial network. National Processing functions as a conduit, not a lender, in this transaction.

The promise to extend credit that the card-issuing bank makes to its own customer is not something United has assumed or could assume even in principle, for no passenger is obliged to buy a future ticket. That many small loans to passengers add up to a large cash flow for the carrier does not turn the intermediary's role into a "financial accommodation." Section 365(c)(2) prevents the assumption of a loan commitment or equivalent promise because the cost of future credit depends on the probability of repayment, and bankruptcy reveals that the risk of nonpayment is higher than the would-be creditor likely assumed. The creditworthiness of the passenger (the borrower on the credit-card loan) does not change with a merchant's bankruptcy, so there is no need to renegotiate the rate of interest. Because customers prepay for travel arrangements more often than they prepay for physical merchandise, the default risk on the merchant side is higher for a firm such as United than for, say, a grocery store. This implies a need to concentrate attention on the back end of the transaction—the chargeback process—rather than the fact that prepaid tickets create float for a merchant. And National Processing contends that it guarantees United's contingent obligations should chargebacks exceed new sales.

Although the Bankruptcy Code does not define "financial accommodation," it is common ground among the parties that a guaranty or other form of suretyship fits the bill. See Uniform Commercial Code §3—419(c) (2002 official draft). See also, e.g., *Thomas B. Hamilton Co.*, 969 F.2d at 1019. National Processing contends that if any non-trivial part of a complex business arrangement can be called a guaranty, then none of the deal may be assumed in bankruptcy. But that is not what the statute says. Assumption is impermissible if "such contract is a contract to make a loan, or extend other debt financing or financial accommodations". The statute asks whether the contract as a whole is a "financial accommodation," not whether one clause could be so characterized. To see the difference, think of a contract that everyone recognizes may be assumed: a lease of operating assets, such as United's aircraft. Although many leases require payment at the start of each month (or other accounting period), some allow payment in mid- month or at month's end, and all leases provide a grace period if payment is not made on time. Take a lease calling for payment in mid-month. It would be possible to call the arrangement a 15-day loan from the lessor to the lessee. Likewise with an executory contract for the sale of goods, with payment due 30 days after the goods are delivered. This contract, too, entails a loan from the vendor to the purchaser. Except for a contract that provides for a bill of lading to be delivered only against a letter of credit—a transaction rare in domestic commerce—almost every lease and other executory contract has some provision that could be characterized as a short-term loan to one side or the other. Credit is implied whenever performance is not simultaneous, and many executory contracts govern transactions in which performance is sequential rather than simultaneous. Accepting National Processing's argument that assumption is impossible when *any* non-trivial clause of a contract entails a loan or guaranty would go far toward defeating debtors' entitlement to assume executory con-

tracts. Doubtless this is why no one (to our knowledge) has argued that debtors cannot assume leases and sales contracts. Well, if a lease may be assumed despite an implicit loan, a credit-card-processing agreement may be assumed despite an implicit guaranty.

To say that a credit or guaranty aspect does not prevent assumption—does not make the contract *as a whole* one "to make a loan" or provide "financial accommodations"—has some potential to invite game-playing. Suppose that a firm seeking a line of revolving credit asks the bank to add a clause promising to sell a rabbit's foot for 50¢. An incidental sale of merchandise would not change the nature of the transaction, however, any more than delivery in advance of payment converts a sale of goods into a contract "to make a loan". We think that *Thomas B. Hamilton Co.* was right to say that a court must determine the nature of the entire transaction rather than hunt for features that look like loans or guarantees. 969 F.2d at 1020. To the extent that the eleventh circuit called this a quest for the principal or primary "purpose," we are skeptical; the contents of business entities' heads are elusive. "Purpose" usually is covered by quicksand. Who can tell what the negotiators were thinking? Why should their thoughts matter? Nothing in the statutory text requires resort to anyone's purposes. Better to concentrate on the actual features of the transaction—an objective rather than a subjective approach. Guaranty plays an objectively small role in the arrangement between National Processing and United; it comes into play only when the net balance of payments is negative, which has never occurred in their experience. Even if guaranty were to play a larger role, it could be carved off and the rest of the contract assumed. (Debtors in bankruptcy can't cherry-pick favorable features of a contract to be assumed, see *In re Crippin*, 877 F.2d 594 (7th Cir. 1989), but may be able to abjure them—to give up a

benefit such as a guaranty, and thus to make the other party to the transaction better off by reducing its obligations.)

For what it may be worth, we are skeptical that the contract United has assumed provides for *any* guaranty of United's contingent indebtedness to its customers. One may search the contract in vain for such a promise. National Processing concedes that it is not there but insists that it may be found in (or implied from) the agreements among merchant and issuing banks in the VISA and MasterCard networks. These agreements oblige merchant banks to cover chargebacks placed into the system by issuing banks, and this obligation—which allocates loss to the merchant bank if the merchant cannot pay—is the financial equivalent of a guaranty, National Processing insists. This brings us back to the point that §365(c)(2) speaks of a contract that *is* a financial accommodation, not one that has economic effects for one party similar to a financial accommodation. From United's perspective, it is irrelevant who among customer, issuing bank, and merchant bank bears any loss. That allocation is extrinsic to United's deal with National Processing and therefore was not "assumed" in the bankruptcy. To put this otherwise: National Processing does not have a contract *with the debtor in bankruptcy* obliging the merchant bank to cover any of the debtor's obligations. United would not have any legal claim against National Processing if an issuing bank (or a passenger) got stuck with a loss. (Nor, as far as we can tell, would a passenger have any legal claim against National Processing.)

We grant that the contract between United and National Processing says that it is subject to and incorporates the rules of the VISA and MasterCard networks, but in this sense every check is subject to the UCC's (and the Federal Reserve's) rules for clearing negotiable paper among banks. That system, like the VISA and MasterCard networks, handles chargebacks and loss allocation. Yet it would not be

sensible to say that those rules mean that the drawee or the depositary bank (either of which may be stuck with a loss if an endorsement is bogus or the drawer lacks sufficient funds) has made a "financial accommodation" to the person presenting the draft for payment.

National Processing has one last argument. Section 365(a) requires the bankruptcy court's approval for any assumption. National Processing asked the bankruptcy judge to condition approval on United's willingness to set aside a reserve of several hundred million dollars to ensure that it could cover chargebacks in the event it stopped flying. The bankruptcy judge said no; the district judge agreed. Section 365(a) requires judicial approval but does not say that approval must be (or even should be) contingent on steps that reduce the other side's risk to zero. Congress *did* include such a provision elsewhere in §365, but only for circumstances in which the debtor was in default. Section 365(b)(1) provides:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee [or debtor in possession] may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
>> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
>>
>> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>>
>> (C) provides adequate assurance of future performance under such contract or lease.

National Processing concedes that United has never defaulted on its obligations under the agreement but nonetheless contends that the bankruptcy judge should have required United to provide the same assurances that would have been required had it done so. That would effectively remove the "if" clause from subsection (b)(1) and make adequate assurances a universal requirement. The bankruptcy judge was right to rebuff such a proposal for amending the statute; it was directed to the wrong branch of government. To the extent that *dicta* in *Thomas B. Hamilton Co.* say that bankruptcy judges should not allow assumption of contracts that expose the other party to "unreasonable risk" (see 969 F.2d at 1021)—whatever "unreasonable" might mean—we do not go along. That limitation does not appear in subsection (a) and, given subsection (b)(1), cannot be imputed to it without abrogating the statute's distinction between default and no-default situations. A bankruptcy judge properly may withhold approval of assumption when an executory contract is no longer in the debtor's interest, or the debtor is unlikely to perform its obligations, but not on an open-ended ground such as "unreasonable" risk to the other contracting party.

The risk of a merchant's deteriorating financial position is one that this contract anticipates. United agreed to pay fees substantially exceeding those of supermarkets and other merchants, reflecting the higher incidence of chargebacks. Moreover, the contract requires United to establish a reserve account in the event the credit rating of its bonds falls. United's bond rating did fall, and it established the reserve according to the contract's specifications. If National Processing wanted a larger reserve, it should have negotiated for this *ex ante* rather than asking the bankruptcy judge to impose it unilaterally. National Processing also could have negotiated for a shorter term (a lot can happen in five years, the length of this contract) or for a higher processing fee in the event risk increases before

expiration. But the actual contract is for a fixed term, at a fixed fee, with only a reserve account as an adjustment for risk. United has kept its part of the bargain and is entitled to insist that National Processing do the same.

AFFIRMED

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*